**TRAFALGAR CAPITAL ASSOCIATES, INC., in its capacity as Managing General Partner of Heywood–Wakefield Associates Limited Partnership, Plaintiff,**

v.

**Henry C. CISNEROS, in his capacity as Secretary of United States Department of United States Department of Housing and Urban Development, Executive Office of Communities and Development, and Rural Housing Improvement, Inc., Defendants.**

No. 95–11267–JLT.

United States District Court,
D. Massachusetts.

July 16, 1997.

Alan M. Spiro, Friedman & Atherton, Boston, MA, Carl A. Coan, Coan & Lyons, Washington, DC, for Trafalgar Capital Associates.

Susan M.Poswistilo, U.S. Atty.'s Office, Boston, MA, for Henry G. Cisneros.

Loretta M. Smith, Atty. Gen.'s Office, Boston, MA, for Executive Office of Communities and Development.

*MEMORANDUM*

TAURO, Chief Judge.

Plaintiff, Trafalgar Capital Associates, Inc. ("Trafalgar"), is a general partner of the Heywood–Wakefield Associates Limited Partnership ("HWLP"). HWLP owns a multi-family rental housing project (the "Project") in Gardner, Massachusetts.

Trafalgar contends that the United States Department of Housing and Urban Development ("HUD") improperly calculated the rents HWLP is entitled to charge tenants of the Project. Trafalgar, in its complaint, seeks mandamus and declaratory relief, in order to force HUD to allow higher rents.

Presently before the court are the parties' cross-motions for summary judgment.

### I.

### *THE SECTION 8 MODERATE REHABILITATION PROGRAM*

Congress passed the Section 8 Moderate Rehabilitation Program of the United States Housing Act of 1937 (the "MRP") with the intention of "aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. § 1437f(a). The MRP creates a procedure by which HUD can subsidize a portion of the rents tenants pay for low-income housing.

Under the MRP, HUD enters into an annual assistance contract with a public housing agency ("PHA"). The PHA then enters into an Agreement to enter into a Housing Assistance Payments contract ("AHAP") with a housing project owner. The AHAP sets forth an estimate of both the base rent and contract rent for the project. The base rent is either the rent for a unit before rehabilitation, or the cost to the owner of owning, managing, and maintaining the unit after rehabilitation. The contract rent is calculated

by adding the monthly cost of financing the rehabilitation and, perhaps, an allowance for the rehabilitation costs not covered by debt to the base rent. The owner will receive, from HUD, through the PHA, the difference between the contract rent and the rent that the tenants are required to pay. Normally, the owner will not begin rehabilitation of the housing project prior to the execution of the AHAP.

After the project is fully rehabilitated, pursuant to certain conditions established in the AHAP, the PHA and the owner will sign a Housing Assistance Payments contract ("HAP"), which sets forth the final base and contract rents. The rents set out in the HAP will mirror the AHAP rents unless they are adjusted pursuant to provisions of the AHAP contract, the HAP contract itself, or HUD regulations.

### II.

### *THE HEYWOOD–WAKEFIELD PROJECT*

On April 13, 1984, Defendant Executive Office of Communities and Development ("EOCD"), a PHA, applied to HUD for funds pursuant to the MRP. HUD approved the application on September 28, 1984.

EOCD and HUD entered into an Annual Contributions Contract ("ACC") on April 3, 1985. The ACC permitted the use of exception rents[1] at 132% of the Existing Housing Fair Market Rents. This provision was based upon the decision of the Regional Administrator of HUD's Boston Regional Office to allow the exception rents.

On October 11, 1985, HWLP borrowed over $10 million from the Massachusetts Housing Finance Agency ("MHFA") for the purpose of rehabilitating the Project. It borrowed over $3 million more on May 12, 1986. Contrary to the normal practice, HWLP began the rehabilitation of the Project prior to the execution of the AHAP.

In addition to the MHFA loans, HWLP will receive a total of over $1 million over fifteen years pursuant to the State Housing

---

**1.** A HUD Field Office may grant exception rents up to a certain level pursuant to HUD Handbook 7420.3 if "special circumstances" warrant doing so.

Assistance for Rental Production ("SHARP") contracts it entered into with the MHFA and EOCD. HWLP executed the SHARP contracts in September 1985 and November 1987.

On April 30, 1986, HWLP signed an AHAP for the purposes of rehabilitating the Project and receiving funds pursuant to the MRP. EOCD and Defendant Rural Housing Improvement, Inc. ("RHI") executed the AHAP on May 6, 1986. The initial base and contract rents for the Project were included in the AHAP.

The rehabilitation of the Project was completed in four separate stages. After each stage, an HAP was executed with regards to the finished rental units. The final stage was completed, and the final HAP executed, on April 17, 1990.

### III.

### *THE COMPLAINT*

On June 15, 1995, Trafalgar filed its complaint. It complains of five separate actions of HUD. It argues that HUD: (1) used improper Fair Market Rents ("FMRs") for the Project; (2) improperly classified the SHARP funds as a grant, rather than a loan; (3) did not fully recognize all of the eligible costs incurred by HWLP during the rehabilitation of the Project; (4) used an incorrect debt-service constant on the MHFA loan; and, (5) unlawfully reversed the Boston Regional Administrator's grant of exception rents.

### IV.

### *FAIR MARKET RENTS*

*A. Accrual*

The maximum rents a property owner may charge under the MRP "shall not exceed by more than 10 per centum the fair market rental established by the Secretary [of HUD] periodically but not less than annually...." 42 U.S.C. § 1437(c)(1). HUD regulations require that the FMRs applicable to a project are the FMRs in effect on the date of the AHAP's execution. 24 C.F.R. § 882.408(c).

HUD's decision to use the Fiscal Year 1985 FMRs ("FY 19* * FMRs") was based upon its understanding that the AHAP applicable to the Project had an effective date of February 8, 1986, and the FY 1986 FMRs were not in effect until, at the earliest, April 22, 1986.[2]

HUD contends that Trafalgar's claim that HUD improperly used the FY 1985 FMRs, instead of the FY 1986 FMRs, is time-barred by the statute of limitations. It argues that Trafalgar's right of action accrued, for that issue, at the latest, when HUD adopted the FY 1986 FMRs for Gardner, Massachusetts, on August 29, 1986. On that date, HUD claims, Trafalgar knew that the rents for the Project were not going to be calculated using the FY 1986 FMRs. It argues, therefore, that Trafalgar could have brought this lawsuit as of that date.

Trafalgar responds that its right of action accrued when it had exhausted all available administrative remedies. Trafalgar argues that HUD's final decision in this case was not rendered until April 7, 1995. Trafalgar's right of action would, therefore, not have accrued until that date.

■ It is settled that only after "a mandatory administrative decision occurs '[does a plaintiff's] claim or right to bring a civil action against the United States mature[ ] and ... [the plaintiff] has the right to demand payment.'" *United States v. Meyer,* 808 F.2d 912, 917 (1st Cir.1987)(quoting *Crown Coat Front Co. v. United States,* 386 U.S. 503, 87 S.Ct. 1177, 18 L.Ed.2d 256 (1967)). In other words, a plaintiff's cause of action accrues only after he has completed all mandatory administrative remedies.

The First Circuit has not ruled explicitly on the question of whether a plaintiff must exhaust all permissive administrative remedies before his cause of action against the United States accrues. *Meyer,* however, is instructive. The *Meyer* court held that the five-year statute of limitations for enforcement of a penalty under the Export Administration Act ran from the date the Department of Commerce imposed the penalty, not

---

**2.** April 22, 1986 was the effective date for the FY 1986 FMRs for most of the country. The FY 1986 FMRs for Gardner, Massachusetts were not final until August 29, 1986.

from the date of the underlying violation. *Meyer*, 808 F.2d at 922. The Defendant in *Meyer* cited the case of *Unexcelled Chemical Corp. v. United States*, 345 U.S. 59, 73 S.Ct. 580, 97 L.Ed. 821 (1953), to bolster his argument that the Government's claim had violated the statute of limitations. The court was not persuaded.

Important to the case before this court, the court in *Meyer* distinguished *Unexcelled*. In *Unexcelled*, the government could file a complaint without going through any administrative proceedings, *if it so* chose, whereas, in *Meyer*, the plaintiff had to undertake certain mandatory administrative procedures. The *Unexcelled* Court held that the cause of action accrued at the time of violation, not at the end of the permissive administrative actions. Id. at 66, 73 S.Ct. at 584. In fact, the Supreme Court itself distinguished *Unexcelled* for that reason in *Crown Coat. Crown Coat*, 386 U.S. at 519, 87 S.Ct. at 1186.

Trafalgar cites *Constant v. United States*, 16 Cl.Ct. 629, aff'd, 884 F.2d 1398 (Fed.Cir.), cert. denied, 493 U.S. 1002, 110 S.Ct. 561, 107 L.Ed.2d 556 (1989), and *Adler v. United States*, 134 Ct.Cl. 200, 146 F.Supp. 956 (1956) for its proposition that the right of action accrued only after all administrative action was completed. Both cases, however, relate to the issue of exhaustion of remedies, not to the issue of when a right of action accrues.

■ This court finds, therefore, that Trafalgar's claim accrued before it began to seek permissive administrative remedies, at the latest, on August 29, 1986, when it became aware that HUD would not use the FY 1986 FMRs to calculate the Project's rents.

*B. Tolling*

■ Before 1990, courts traditionally would not apply equitable principles to the tolling of statutes of limitations in cases against the United States. *Oropallo v. United States*, 994 F.2d 25, 28 (1st Cir.1993), cert. denied, 510 U.S. 1050, 114 S.Ct. 705, 126 L.Ed.2d 671 (1994). The Supreme Court changed that practice with its holding in *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990). In *Irwin*, the Court held that "the

same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States." Id. at 95–96, 111 S.Ct. at 457. Still, according to the First Circuit, "[i]t is axiomatic that 'the grounds for tolling statutes of limitations are more limited in suits against the government. . . . ' " *Kelley v. National Labor Relations Board*, 79 F.3d 1238, 1248 (1st Cir.1996) (quoting *Swietlik v. United States*, 779 F.2d 1306, 1311 (7th Cir. 1985)). Trafalgar claims that the statute of limitations should be tolled for the period of time it was pursuing non-mandatory administrative remedies.

The weight of authority is against tolling in this situation. Courts have generally adopted the rule that the pursuit of permissive administrative remedies does not necessarily toll the statute of limitations. *See, e.g., Brighton Village Associates v. United States*, 52 F.3d 1056, 1060 (Fed.Cir.1995). See also *Cowhig v. Marsh*, 693 F.2d 234, 235 (1st Cir.1982), cert. denied, 460 U.S. 1092, 103 S.Ct. 1793, 76 L.Ed.2d 359 (1983).

■ The First Circuit noted in *Kelley* that equitable tolling "is 'appropriate only when the circumstances that cause a plaintiff to miss a filing deadline are out of his [or her] hands.' " *Kelley*, 79 F.3d at 1248 (quoting *Heideman v. PFL, Inc.*, 904 F.2d 1262, 1266 (8th Cir.1990), cert. denied, 498 U.S. 1026, 111 S.Ct. 676, 112 L.Ed.2d 668 (1991)). The court recognized a five-factor balancing test in deciding whether to equitably toll a statute of limitations. Id. at 1248. The five factors are: "(1) lack of actual notice of the filing requirement; (2) lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the defendant; and (5) a plaintiff's reasonableness in remaining ignorant of the notice requirement." Id. Furthermore, the court found that "[c]ases in which the equitable tolling doctrine is invoked are most often characterized by some affirmative misconduct by the party against whom it is employed, such as an employer or an administrative agency." Id.

■ Here, Trafalgar does not argue that HUD ever acted improperly during negotiations, nor that there existed circumstances

beyond Trafalgar's own control that prevented it from filing earlier. Trafalgar could have filed at any time after it was aware of the use of the FY 1985 FMRs. It chose not to.

*Brighton Village* is squarely on point. In 1991, an owner of Section 8 subsidized housing in Brighton, Massachusetts filed a complaint alleging breach of contract because HUD failed to raise the contract rents from 1981–1986. *Brighton Village*, 52 F.3d at 1057. The Federal Circuit affirmed the decision of the District Court, dismissing the claims regarding the years 1981 through 1984. *Id.* at 1061.

The court found no reason to toll the statute of limitations. Id. at 1060–61. It held that "Brighton's pursuit of administrative remedies did not interfere with its ability to satisfy the statute of limitations." *Id.* at 1060. Brighton, for example, could have filed a protective action and then moved for a stay of the proceedings. *Id.* Also, the court found that "Brighton did not toll the limitations period by negotiating with HUD." *Id.* at 1061.

The one distinction between *Brighton Village* and the case before this court is that Trafalgar was quite diligent in pursuing administrative remedies, whereas Brighton was not. *Id.* To allow this difference to be determinative, however, would undercut the general rule that tolling does not occur during the pursuit of permissive administrative remedies. Any plaintiff, merely by seeking such remedies quickly, would be able to toll the statute.

This court holds that the statute of limitations did not toll, and, therefore, Trafalgar's claim that HUD used the improper FMRs is time-barred.

## V.

### SHARP FUND

#### A. Statute of Limitations

HUD claims that the right of action as to the issue of whether it correctly characterized the SHARP funds as a grant rather than loan accrued on April 30, 1986, the date the AHAP was executed. It is on that date, HUD contends, that Trafalgar was aware that HUD would not characterize the funds as a loan and could have brought its lawsuit. The right of action, therefore, would be barred by the six-year statute of limitations.

Trafalgar argues that the right of action did not accrue until April 17, 1990, the date the HAP was executed. Trafalgar's claim is that, until the execution of the HAP, the base rents could have changed upward or downward pursuant to the AHAP. Trafalgar cites a number of times when the base rents were reviewed and changed before the execution of the HAP.

Section 1.5(a) of the AHAP states:

The initial Contract and Base Rent for each unit must be determined in accordance with HUD requirements. The Contract and Base Rents stated in Exhibit C will be the initial Contract and Base Rents specified in the Contract unless changes are made by the [PHA] in accordance with HUD requirements, including the correction of errors in computation of Base Rents or Contract Rents. Increases in Contract Rents during the rehabilitation period are permitted only with [PHA] approval, and only if the increases are consistent with HUD requirements.

■ Trafalgar was on notice, at the time of the AHAP execution, that the SHARP funds would be designated as a grant, and, therefore, deducted from the monthly debt-service calculations. The AHAP, however, allows for the change of that characterization in accordance with HUD policy without any request by Trafalgar.

HUD argues that, at the time of the AHAP execution, Trafalgar was aware of the *HUD policy* to treat SHARP funds as grants and not as loans. It points to the fact that, in the rent calculations it used to approve the rents to be included in the AHAP, the SHARP funds were characterized as grants. As a result, section 1.5(a) of the AHAP could not result in a change of HUD's characterization of the SHARP funds, because any change would be a violation of HUD policy.

There is no evidence, however, that HUD's treatment of the SHARP funds was pursuant to any actual policy. HUD points to the fact that it had treated SHARP funds as grants

for previous housing projects. The past treatment of SHARP funds, however, does not establish a policy, per se. In fact, it appears from the record that HUD made an individualized decision to characterize the SHARP funds for the Project as a grant. It used past practice as support for that decision, but it was not bound by it as a policy.

The AHAP, by its plain language, allowed HUD to change its characterization of the SHARP funds at any time prior to the execution of the HAP. Here, the HAP was executed less than six years prior to the filing of Trafalgar's complaint. Trafalgar's objection to HUD's characterization of the SHARP funds, therefore, is not barred by the statute of limitations.

## B. Merits

Under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701 et seq., this court must examine HUD's classification of the SHARP funds under the deferential "arbitrary and capricious" standard. 5 U.S.C. § 706(2)(A).

█ The funds dispersed pursuant to the SHARP program are meant to "facilitate the construction or rehabilitation of rental housing projects in locations where there is a need for such housing." Mass.Gen.L. ch. 23B § 27. The SHARP funds dispersed for the Project will be paid out annually over a fifteen year period. The principal and interest are to be repaid on December 1, 2016. Under Massachusetts law, it is not necessary for the principal to be repaid in cash. Id. It may be "recycled" into benefits for the tenants of the Project. Id.

HUD contends that two factors make its classification of the SHARP funds reasonable—that the funds need not be repaid until after the term of the HAP, and the "recycling" option. This court finds that neither of these facts changes the obvious character of the SHARP dispersement from a loan to a grant.

HWLP entered into a contract with EOCD to receive SHARP funds. That contract is independent of the HAP. This court finds little relevance that the termination of the SHARP contract and the eventual repayment of funds occur after the termination of the HAP. Perhaps if the funds were to be repaid in an extremely lengthy period of time, there would be more credence to HUD's argument. But a thirty year mortgage is not unusual. HUD would not argue that a homeowner who takes out a thirty year mortgage has received a gift from the bank and not a loan. This court refuses to adopt HUD's flawed reasoning.

This court also will not accept HUD's erroneous argument that the "recycling" of HWLP's payments creates a grant and not a loan. The court can find no authority for HUD's contention that the "recycling" provision required by the SHARP statute could result in HWLP never paying back the principal of the loan. In fact, the SHARP statute expressly provides that "MHFA shall not waive any loan in whole or in part." Mass. Gen.L. ch. 23B § 27. It is entirely unreasonable to suggest that, because the eventual recipients of HWLP's repayment are the tenants of low and moderate income housing, HWLP is not, in reality, paying back the loan's principal.

This court holds, therefore, that HUD's classification of the SHARP funds as a grant, as opposed to a loan, was arbitrary and capricious.

## VI.

### REHABILITATION COSTS

█ On February 5, 1986, the parties met to resolve the problem caused by HWLP's commencement of the rehabilitation of the Project before the execution of the AHAP. HWLP wanted the cost of the pre-AHAP rehabilitation to be used in the calculation of the base rents. At the meeting, the parties agreed to use costs incurred prior to February 8, 1986 in the calculation of the base rents. The parties disagree as to how that calculation was to be made.

HUD states that it agreed to consider the pre-February 8 costs in the calculation of the Project's cash equity, and that it did just that. HUD contends that Trafalgar seeks the inclusion of the costs of financing the rehabilitation in the base rents, and that such

a calculation would be inappropriate and in violation of HUD regulations.

The base rents are calculated in order to allow the property owner to recoup the cost of purchasing, maintaining, and improving the property. HUD Handbook 7420.3 Appendix 31. Having agreed to use pre-February 8, 1986 expenditures in the calculation of base rents, HUD now attempts, for all intents and purposes, to void that arrangement by drawing a distinction between money HWLP had on hand independent of the rehabilitation of the Project, and money it had to borrow for the purpose of rehabilitation. This court holds that such a distinction, in this case, is "arbitrary and capricious" pursuant to the APA 5 U.S.C. § 706(2)(A).

Prior to February 8, 1986, HWLP paid $1,648,910 in order to rehabilitate the Project. The base rents, in order to account for that cost, must include that expense. The source of the funds is irrelevant. HWLP spent the money for the rehabilitation of the Project, and such an expenditure should be considered in the calculation of the Project's rents.

## VII.

### *DEBT–SERVICE CONSTANT*

■ In addition to the SHARP loan, HWLP received a loan from MHFA. The parties agree that HUD used an improper debt-service constant for the loan while calculating the contract rents for the Project. The parties, however, disagree on whether any change is required in the contract rents for the Project on account of HUD's error.

Section 1.5(a) of the HAP reads:

The initial Contract and Base Rent for each Contract Unit are stated in Exhibit A. These rents are subject to post-audit and change in accordance with HUD requirements, including the correction of errors in computation.

Trafalgar contends that a change in the debt-service constant is a "correction of errors in computation." HUD disagrees.

HUD relies on *2255 New York Ave., Ltd. v. Cisneros,* 842 F.Supp. 924 (N.D.Tex.1994), *aff'd,* 38 F.3d 210 (5th Cir.1994), for the proposition that this debt-service change would not fall under section 1.5(a). In *2255 New York,* HUD attempted to roll back the contract rents of an MRP project. It based its decision on corrections made by a review team four years after all rehabilitation work was completed.

The *2255 New York* court does say that, "four years after the fact would be too late as a matter of law for a 'post-audit' under authority of § 1.5.A." *2255 New York,* 842 F.Supp. at 931. *2255 New York,* however, is easily distinguished from the case presently before this court. There, the change in question was a change in judgment. *Id.* Here, the challenged HUD action is a pure error in calculation, not judgment. This court believes there to be a great difference in reversing a "judgment call" four years after the fact, and changing a debt-service constant in order to conform with the law.

This court holds, therefore, that the HAP authorizes HUD to correct the debt-service constant on the MHFA loans, and to increase the Project's rents accordingly. HUD's refusal to do so, therefore, is "arbitrary and capricious" under the APA. 5 U.S.C. § 706(2)(A)

## VIII.

### *EXCEPTION RENTS*

On February 19, 1984, the Regional Administrator for HUD approved a contract rent higher than normally permitted. He granted an "exception rent" pursuant to the HUD Handbook 7420.3. HUD now alleges that the decision was improper. It is HUD's contention that, even if the extra rehabilitation costs and the debt-service constant are counted against HUD, the revocation of the allegedly improperly granted exception rent more than makes up for the errors.

Trafalgar makes a number of arguments as to why the Regional Administrator's decision is now binding on HUD—regardless of the propriety of the decision. One, however, is particularly compelling. Trafalgar contends that 42 U.S.C. § 1437f(c)(2)(C) bars HUD from revoking the exception rent.

The pertinent part of 42 U.S.C. § 1437f(c)(2)(C) reads:

The Secretary [of HUD] may not reduce the contract rents in effect on or after April 15, 1987, for newly constructed, substantially rehabilitated, or moderately rehabilitated projects assisted under this section ... unless the project has been refinanced in a manner that reduces the periodic payments of the owner.

To offset the required correction of other errors, which would result in an increase of the contract rents, by lowering the exception rent would be a lowering of the contract rent. If HUD did not correct the exception rent, and the other errors were fixed, the contract rent would be higher. Consequently, keeping the contract rent at its current level, after the recognition that corrections require it to be higher, is a de facto lowering of the contract rent from the level at which it should be set.

Trafalgar, therefore, argues that HUD is attempting to reduce the contract rent in violation of 42 U.S.C. 1437f, which only allows a reduction when a project has been "refinanced in a manner that reduces the periodic payments of the owner."

In other circuits, courts have read section 1437f to limit HUD greatly. *2225 New York*, 38 F.3d 210; *Foxglenn Investors Limited Partnership v. Cisneros*, 35 F.3d 947 (4th Cir.1994); *Terrace Housing Associates, Ltd. v. Cisneros*, 32 F.3d 461 (10th cir.1994). In all three cases, HUD attempted to lower the contract rents to correct "errors" in the initial contract rents. All three courts held that the plain meaning of 42 U.S.C. § 1437f(c)(2)(C) barred such a correction.

HUD argues that if it is barred from offsetting the changes with a lowering of the exception rents, HWLP will be charging rents greater than the law allows. This court disagrees. The law allows HUD to grant exception rents. The law allows and requires the parties to determine the contract rents. The law allows and requires the correction of certain errors in the parties' calculations. The law, however, does not allow HUD to lower rents it initially granted, even if it did so improperly.

■ This court holds that the plain language of 42 U.S.C. § 1437f(c)(2)(C) controls in the present case. HUD may not, therefore, offset the increase in Project rents due to the additional rehabilitation costs and the correction of the debt-service constant, with a reversal of the Boston Regional Administrator's decision to grant exception rents.

### IX.

### *CONCLUSION*

For the reasons stated above, the court ALLOWS in part and DENIES in part Trafalgar's motion for summary judgment, ALLOWS in part and DENIES in part Defendants' motion for summary judgment, and declares the following: (1) Trafalgar's allegation that HUD should have used FY 1986 FMRs is time-barred; (2) HUD's decision to classify SHARP funds as a loan was arbitrary and capricious; (3) HUD's failure to include all of the pre-February 8, 1986 rehabilitation costs in its calculation of the Project's contract rents was arbitrary and capricious; (4) HUD's decision not to correct the debt-service calculations was arbitrary and capricious; and, (5) HUD may not offset required rent increases with a reversal of its Regional Administrator's decision to grant exception rents.