USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit
 
 

No. 97-2152

 TRAFALGAR CAPITAL ASSOCIATES, INC., ETC.,

 Plaintiff, Appellee,

 v.

 ANDREW CUOMO, ETC., 

 Defendant, Appellant,

 EXECUTIVE OFFICE OF COMMUNITIES AND DEVELOPMENT, ET AL.,
 
 Defendants, Appellees.
 
 

No. 97-2153

 TRAFALGAR CAPITAL ASSOCIATES, INC., ETC.,

 Plaintiff, Appellant,

 v.

 ANDREW CUOMO, ETC., ET AL., 

 Defendants, Appellees.

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Joseph L. Tauro, U.S. District Judge]

 Before
 Selya, Circuit Judge,
 Aldrich and Coffin, Senior Circuit Judges.
 
 

 Maria Simon, Attorney, Appellate Staff, with whom Frank W.
Hunger, Assistant Attorney General, Donald K. Stern, United States
Attorney, and John F. Daly, Attorney, Appellate Staff, were on
brief for Andrew Cuomo, Etc.
 Carl A.S. Coan, Jr., with whom Carl A.S. Coan III, was on
brief for Trafalgar Capital Associates, Inc.

 
 
 October 29, 1998
 
 
 
 
 

 COFFIN, Senior Circuit Judge. The United States
Department of Housing and Urban Development ("HUD") agreed to
subsidize a portion of tenants' rents in a housing rehabilitation
project owned by the Heywood-Wakefield Associates Limited
Partnership ("Heywood-Wakefield"). Appellee/cross-appellant
Trafalgar Capital Associates, Inc. ("Trafalgar"), the general
partner of Heywood-Wakefield, complained that HUD miscalculated
the amounts to which the project was entitled. Upon cross-motions
for summary judgment, the district court found that three decisions
by HUD were arbitrary and capricious and that Trafalgar's claim on
a fourth HUD decision was barred by the statute of limitations. We
hold that the district court erred on two of the claims, but
correctly ruled for HUD on the third and on the statute of
limitations. We accordingly affirm in part, and reverse in part. 
 I. Background
A. Statutory Scheme
 HUD agreed to subsidize Trafalgar's project under the
Moderate Rehabilitation Program, 42 U.S.C. 1437f(e)(2), one of
the programs under Section 8 of the United States Housing Act of
1937, 42 U.S.C. 1437f ("Section 8"). The Moderate
Rehabilitation Program is designed to encourage private individuals
to rehabilitate low and moderate income housing through the award
of rent subsidies. Under the program, HUD contracts with local
public housing agencies, which in turn contract with the project
owners who rehabilitate the property. Regulations require the
local public housing agency to secure a preliminary contract with
the project owner prior to rehabilitation, and a permanent
agreement once the rehabilitation is completed and the units are
ready for occupancy. 
 Both the preliminary agreement, known as the "AHAP," or
Agreement to Enter into a Housing Assistance Payments contract, and
the permanent agreement, known as the "HAP," or Housing Assistance
Payments contract, set a "contract rent" based on the applicable
regulations. See 24 C.F.R. 882.408 (1998). Residents eligible
for Section 8 housing are required to pay rent based on their
monthly income. See 42 U.S.C. 1437a(a). HUD pays the owner the
difference between the "contract rent" and the amount the resident
pays. See 42 U.S.C. 1437f(c)(3)(A). 
 The contract rent is based on two components: 1) the
"monthly rehabilitation debt service," which covers the cost of
rehabilitation; and 2) the "base rent," reflecting the cost of
owning, managing, and maintaining the property independent of
rehabilitation costs. See 24 C.F.R. 882.408(c)(2) (1998). The
base rent is also allowed to incorporate a reasonable return on
investment. HUD Handbook 7420.3 ("HUD Handbook"), p. 2. Both the
base rent component and the contract rent total are subject to
market-based ceilings, and are adjusted annually. See 42 U.S.C.
 1437f(c); 24 C.F.R. 882.410(a)(1) (1998). The base rent is
ordinarily capped at the Existing Housing Fair Market Rent ("FMR"),
and the contract rent has a ceiling of 120 percent of the relevant
FMR. See 42 U.S.C. 1437f(c); 24 C.F.R. 882.408(a) (1998). 
FMRs, published annually by HUD, are based on an analysis of the
rents charged for similar standard units in the same general
geographic region. See 42 U.S.C. 1437f(c).
 In certain situations HUD can approve increases for costs
not sufficiently taken into account in the contract rent
calculation. An "exception rent" may be granted if the FMR does
not accurately reflect the actual rents charged in the project's
"specified area," meaning its more narrowly defined geographic
region. See 24 C.F.R. 882.408(b) (1998), HUD Handbook, Ch. 10,
10-2(c)(1). If HUD approves such an exception rent, the owner may
charge an additional 10 percent over the usual contract rent
ceiling. See 24 C.F.R. 882.408(b) (1998).
B. Facts
 In February 1984, Trafalgar filed its proposal with HUD
to convert an abandoned furniture factory in Gardner, Massachusetts
into moderate income housing. The preliminary AHAP for the project
was executed on April 30, 1986, with a retroactive effective date
of February 8, 1986. The rehabilitation proceeded in four stages. 
After the fourth stage was completed, the final portion of the
permanent HAP was executed on April 17, 1990.
 Trafalgar also has a contract in connection with the same
project to receive more than $1.1 million in assistance over 15
years from a state program known as the Massachusetts State Housing
Assistance for Rental Production ("SHARP") program.
 Trafalgar believed that HUD made several incorrect
decisions that had the effect of reducing the subsidies to which
Trafalgar was entitled. After lengthy correspondence and proposals
to revise the HAP, Trafalgar brought this action under the
Administrative Procedure Act ("APA"), 5 U.S.C. 551-59, 701-6,
and the Declaratory Judgment Act, 28 U.S.C. 2201. Trafalgar's
complaint charged four errors: (1) HUD erroneously excluded costs
incurred before the AHAP; (2) HUD improperly refused to raise the
contract rent after offsetting errors were discovered; (3) HUD
mistakenly characterized the Massachusetts SHARP assistance as a
grant rather than a loan; and (4) HUD incorrectly used the 1985 FMR
instead of the 1986 FMR. Upon cross-motions for summary judgment,
the district court ruled that HUD's decisions on the first three
issues were arbitrary and capricious, but that Trafalgar's claim on
the fourth was barred by the statute of limitations. Both parties
appealed.
 Additional facts will be developed in subsequent sections 
as they become relevant.
 II. Discussion
 This court reviews the district court's grant of summary
judgment de novo, viewing the facts in the light most favorable to
the non-moving party. See FDIC v. Kane, 148 F.3d 36, 38 (1st Cir.
1998). We can affirm only if "the record discloses no trialworthy
issue of material fact and the moving party is entitled to judgment
as a matter of law." EEOC v. Green, 76 F.3d 19, 23 (1st Cir.
1996).
 With respect to the three HUD decisions, they can only be
set aside if they are "arbitrary, capricious, an abuse of
discretion, or otherwise not in accordance with law." 5 U.S.C. 
706(2)(A). When exposed to judicial review, HUD's decisions are
entitled to "great deference" and are presumed valid. Associated
Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 109 (1st Cir.
1997). The court must affirm HUD's decisions if they are
"reasoned, and supported by substantial evidence in the record." 
Id. "Although searching and careful, review under the 'arbitrary
and capricious' standard is narrow in scope." Pan Am. Grain Mfg.
Co. v. E.P.A., 95 F.3d 101, 103 (1st Cir. 1996). The court may not
substitute its judgment for that of the agency, and agency
decisions will be upheld so long as they "do not collide directly
with substantive statutory commands and so long as procedural
corners are squarely turned." Adams v. E.P.A., 38 F.3d 43, 49 (1st
Cir. 1994). The court's deference to HUD's decisions "is magnified
when the agency interprets its own regulations." Puerto Rico
Aqueduct & Sewer Auth. v. E.P.A., 35 F.3d 600, 604 (1st Cir. 1994). 
While this standard of review is highly deferential, "it is not a
rubber stamp." Citizens Awareness Network, Inc. v. U.S. Nuclear
Regulatory Comm'n, 59 F.3d 284, 290 (1st Cir. 1995). To avoid
being found arbitrary and capricious, HUD's decision must be
rational; that is it "must make sense to [the] reviewing court[]." 
Puerto Rico Sun Oil Co. v. E.P.A., 8 F.3d 73, 77 (1st Cir. 1993).
 Whether the statute of limitations barred Trafalgar's
claim regarding the relevant FMR is an issue of law, and that
aspect of the district court's decision will be reviewed de novo.
See American Airlines, Inc. v. Cardoza-Rodriguez, 133 F.3d 111, 125
(1st Cir. 1998).
A. Whether HUD improperly excluded costs incurred before February
8, 1985 from the rent calculation.
 Although HUD regulations require that the parties execute
an AHAP before the owner begins rehabilitation, see 42 C.F.R. 
882.505 (1998), Trafalgar started work before executing such an
agreement. When the public housing agency overseeing
rehabilitation learned of Trafalgar's failure to enter into the
AHAP, it ordered rehabilitation halted, and a meeting was called on
February 5, 1986. At that meeting the parties agreed to execute an
AHAP, which they finally did on April 30, 1986. Because it was
clear that the AHAP would be executed, and the parties wanted
rehabilitation to continue, they agreed at the meeting to backdate
the AHAP to February 8, 1986, three days hence. 
 Between the date the proposal was submitted and February
8, 1986, Trafalgar had spent about $1.6 million on rehabilitation.
At the February 5 meeting the parties discussed how these funds
might be incorporated into the amounts Trafalgar could recover from
HUD, but they evidently did not settle the specific method for
doing so. HUD, however, later determined that regulations barred
including the $1.6 million in the subsidy calculations. The
district court ruled that HUD's apparent reversal was arbitrary and
capricious. Our review persuades us to the contrary.
 It is undisputed that Trafalgar's pre-AHAP costs could
only be incorporated into the base rent section of the contract
rent because the monthly rehabilitation debt service may include
only the rehabilitation costs incurred after the AHAP's effective
date. Trafalgar argues that the amount should be allowed under
either of two different sub-parts of base rent: the property debt
service or return on investment. HUD argues that the structure and
language of the regulations prohibit it from including the disputed
costs in either category. We consider each possibility in turn.
 1. Property Debt Service. HUD denied Trafalgar's request
that the expenses be included in the property debt service on the
ground that that component is temporally limited to costs incurred
before the project proposal is submitted to HUD. Trafalgar argues
that the regulations and HUD Handbook impose no such limitation. 
Each side cites language in the HUD Handbook to support its
position.
 The Handbook sets forth detailed guidelines to which HUD
must adhere in setting the terms of an AHAP and a HAP. It includes
a form for calculating the base and contract rents, as well as
extensive instructions on how to complete the form. HUD points to
the "property debt service" instructions, which require the owner
to "[e]nter the annual principal and interest (P & I) payments for
loans related to purchase and improvement of the property at the
date of proposal submittal." HUD Handbook, p. 9 (emphasis omitted
and added). 
 Trafalgar, in response, looks to the general overview
language, which states that the base rent should reflect the
"[a]nnual expenses for property debt service, insurance, taxes,
utilities, management, and maintenance, projected to the date of
HAP contract execution." HUD Handbook, p. 2 (emphasis added). 
However, Trafalgar neglects to mention that the Handbook describes
this overview as a "brief summary," and notes that "[d]etailed
instructions are contained in the rent calculation formats." Id. 
The fact that the overview language states that a variety of costs
should be calculated to the date of the HAP contract execution does
not alter Trafalgar's obligation to comply with the specific
instructions on how those calculations are to be performed. As HUD
recognizes, the provision allowing for annual expenses to be
"projected to the date of HAP contract execution," is HUD's method
of acknowledging that estimated increases in operating costs should
be included. The provision does not authorize inclusion of
rehabilitation costs, or any other costs not otherwise within the
instructions for property debt service.
 The well-known canon of statutory construction that the
specific governs the general dictates the same result. See Moralesv. Trans World Airlines, Inc., 504 U.S. 374, 384-85 (1992); Lloydv. FDIC, 22 F.3d 335, 337 (1st Cir. 1994). The specific limitation
that property debt service includes only costs prior to proposal
submission trumps the general language that the costs should be
calculated through the date of HAP execution.
 Not only the Handbook's language but also the logic of
the subsidy program supports HUD's position. In essence Trafalgar
argues that the $1.6 million is recoverable as part of the property
debt service regardless of when it was spent. This approach would
justify inclusion of the same costs in two parts of the contract
rent. If Trafalgar had followed the HUD regulations and executed
an AHAP prior to beginning rehabilitation, the costs would have
been includable in the monthly rehabilitation debt service
component. Its argument here is that they are also recoverable
under the property debt service sub-part of base rent. Trafalgar's
argument assumes a redundancy in the Handbook, and deprives the
distinction between rehabilitation debt service and base rent of
any sense. The structure of the subsidy calculations confirms the
conclusion that Trafalgar is not entitled to recover these pre-AHAP
rehabilitation costs as part of the property debt service.
 2. Return on Investment. The only other possible method
for recovering these costs is including them as part of "an
adequate return on the owner's investment." HUD Handbook, p. 2. 
In general, return on investment is limited in the same manner as
the property debt service: it is capped at "the owner's actual cash
equity in the property at the time of proposal submission." HUD
Handbook, p. 13 (emphasis added). However, the notes detailing how
to calculate return on investment create a narrow exception for
post-proposal, pre-AHAP investment.
 Under the Handbook the return on investment element may
include post-proposal costs if two conditions are met: 1) a
"prolonged period [must have] elapsed between proposal submission
and [AHAP] execution;" and 2) consistent with other requests for
return on investment, the costs must be expended from "actual cash
equity." HUD Handbook, p. 13. Actual cash equity is defined as
the cost of capital expenditures less the outstanding indebtedness. 
See id. Taking these provisions together, the owner may capture an
adequate return on investment for rehabilitation undertaken only
through capital expenditures, not through borrowed funds, and only 
if there was a prolonged delay between proposal and AHAP. 
 HUD determined that Trafalgar's post-proposal, pre-AHAP
costs could not be included in a return on investment request,
despite its meeting the prolonged period element, because Trafalgar
failed to meet the actual cash equity requirement. The $1.6
million was expended from borrowed funds, not owner capital. 
Trafalgar argues that differentiating between actual cash equity
and financed funds for the purposes of return on investment is
arbitrary and capricious. 
 In our view, limiting return on investment to capital
expenditures is fully supportable. HUD recognizes that the larger
costs, such as the cost of acquiring the property, could either be
financed or paid out of owner capital, and has established a scheme
to deal with each scenario. For financed costs, HUD allows the
owner to be repaid the principal and interest through property debt
service. For large costs paid from owner capital, HUD allows the
owner to recoup the expenditure plus a reasonable "return on
investment." In theory then, owners are repaid any borrowed costs
through property debt service and any capital expenditures through
return on investment. Under this scheme, it is not arbitrary and
capricious to restrict property debt service to outstanding
indebtedness, and limit return on investment to actual cash equity.
 The problem for Trafalgar is that it incurred
rehabilitation expenses earlier than it should have. Had Trafalgar
complied with HUD regulations and executed an AHAP before
commencing rehabilitation, see 24 C.F.R. 882.505 (1998), its
costs would have been incorporated into rehabilitation debt
service. Although the parties discussed the possibility of
including pre-AHAP costs in base rent, the HUD Handbook, available
to Trafalgar at the time, provides for return on investment only if
the two conditions are met. HUD's ultimate decision to follow its
Handbook in dealing with the situation once it understood that
Trafalgar could not comply with both conditions was "reasoned and
supported by substantial evidence in the record." Associate
Fisheries, 127 F.3d at 109. In fact, a decision to allow Trafalgar
to recover these costs, contrary to the regulations and the HUD
Handbook, might have provoked criticism that HUD was acting
arbitrarily and capriciously by inconsistently applying its own
policies.
 We therefore conclude that HUD appropriately denied
Trafalgar's request to include the $1.6 million in base rent. 
HUD's regulations reasonably barred incorporating these costs in
either the property debt service component or return on investment
allowance, and the agency's decision to follow those regulations
cannot be termed arbitrary or capricious. The district court's
finding to the contrary must be reversed.
B. Whether HUD inappropriately refused to raise the contract rents
after two errors were discovered.
 In the HAP, HUD made two errors in calculating the
contract rent, one to Trafalgar's detriment and the other to its
benefit. HUD refused to remedy the error that disadvantaged
Trafalgar because this error was more than offset by the mistake to
Trafalgar's benefit. The district court found HUD's decision to
maintain the status quo arbitrary and capricious. We disagree.
 On September 24, 1984, the public housing agency
sponsoring the project requested an "exception rent," allowing for
a 10 percent increase in the contract rent ceiling. Under the
regulations, an exception rent is appropriate only when the rate
otherwise applicable does not accurately reflect the rents being
charged in the project's specific geographic area. See 24 C.F.R.
 882.408(b) (1998). HUD's Boston Regional Office initially denied
the request, and Trafalgar appealed the denial to the Assistant
Secretary for Housing. Before HUD headquarters had decided the
appeal, however, the Regional Administrator reassessed the
situation, reversed the earlier decision, and erroneously agreed to
allow Trafalgar to charge an exception rent. The very next day,
HUD headquarters, unaware of the Regional Director's new decision,
affirmed the earlier denial of an exception rent. Since the
Regional Administrator had approved the request, the HAP included
the erroneous exception rent, to Trafalgar's benefit.
 The other error in the HAP stemmed from HUD's application
of the wrong debt service constant, which had the effect of
reducing the contract rent, thereby limiting how much Trafalgar
could recoup from HUD. HUD has conceded it made this debt service
error and that it negatively impacted Trafalgar's payment from HUD. 
 When the debt service error was discovered in 1992,
Trafalgar requested a correction. As a result of this request, HUD
was required to recalculate the contract rent, and, in the course
of doing so, realized the error in allowing Trafalgar to charge an
exception rent. HUD decided that the most appropriate course of
action would be to correct all errors. 
 The exception rent error, accruing to Trafalgar's
benefit, was greater than the debt service error, to its detriment. 
Correction of both errors would therefore end up lowering, rather
than raising, the contract rent, and would reduce the amounts
Trafalgar would receive from HUD. An amendment to the Moderate
Rehabilitation Program statute prohibits HUD from reducing the
contract rents in effect on or after April 15, 1987, see 42 U.S.C.
 1437f(c)(2)(C), except when the property is refinanced and the
owner's debt costs are decreased. Since the correction of both
errors would have resulted in reducing the contract rent in
violation of the statute, HUD chose to maintain the status quo with
the two errors.
 Upon cross-motions for summary judgment, the district
court separated the two errors. Addressing the debt service
mistake first, the court found that HUD was required to make a
correction. In support of this decision, the court emphasized the
language of paragraph 1.5 of the HAP, which states that contract
rents "are subject to post-audit and change in accordance with HUD
requirements, including the correction of errors in computation." 
Trafalgar Capital Assoc., Inc. v. Cisneros, 973 F. Supp. 214, 221
(D. Mass. 1997) (quoting HAP, 1.5). The district court found
this mistake to be an error in computation that had to be corrected
in accordance with that paragraph's mandate. See id. Having found
that HUD was required to correct the debt service constant, the
district court went on to consider the exception rent mistake. It
determined that correcting that error would result in a reduction
contrary to 1437f(c)(2)(C)'s mandate. The net result of the
district court's ruling left HUD correcting the debt service error,
but Trafalgar continuing to benefit from the exception rent error.
 HUD argues on appeal that it was entitled to offset the
errors and that, because the net result would disadvantage
Trafalgar, it could maintain the status quo in order to comply with
the statutory prohibition against reducing the contract rents. 
Trafalgar argues that failure to correct the debt service error
causes a de facto reduction because using the correct debt service
constant would have produced a higher contract rent.
 To determine whether HUD's decision to maintain the
status quo was legitimate, we look to the anti-reduction provision
of the statute. The "starting point for interpretation of a
statute 'is the language of the statute itself.'" Kaiser Aluminum
& Chem. Corp. v. Bonjorno, 494 U.S. 827, 835 (1990) (quoting
Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102,
108 (1980)); see Arnold v. United Parcel Service, Inc., 136 F.3d
854, 857-58 (1st Cir. 1998). "If the intent of Congress is clear,
that is the end of the matter; for the court, as well as the
agency, must give effect to the unambiguously expressed intent of
Congress." Chevron USA Inc. v. Natural Resources Defense Council,
Inc., 467 U.S. 837, 842-43 (1984). If the statutory text and
congressional intent are ambiguous, HUD's interpretation is
entitled to deference if it is reasonable. See id. at 844-45.
 The statute provides:
 The Secretary may not reduce the contract
 rents in effect on or after April 15, 1987,
 for newly constructed, substantially
 rehabilitated, or moderately rehabilitated
 projects assisted under this section
 (including projects assisted under this
 section as in effect prior to November 30,
 1983), unless the project has been refinanced
 in a manner that reduces the periodic payments
 of the owner. 

42 U.S.C. 1437f(c)(2)(C). We first must determine what contract
rent was "in effect," and then must assess whether HUD's decision
to maintain the error-riddled status quo reduced that rent in
violation of the statute.
 1. Contract Rent In Effect. The only contract rent used
by the parties is the erroneous rent set in the HAP in 1990. 
Trafalgar argues that that contract rent was not "in effect" within
the meaning of the statute, because the regulations require HUD to
raise the contract rent to correct the debt service error. 
Trafalgar maintains that, therefore, "by law, the increased
'contract rents' were 'in effect' and HUD's refusal to raise the
[contract rents accordingly] constituted a de facto reduction . .
. in violation of 42 U.S.C.A. 1437f(c)(2)(C)." (Brief for
appellee/cross-appellant, p. 25).
 The regulation on which Trafalgar relies provides that
the "initial Contract Rents . . . will be the Contract Rents on the
effective date of the [HAP] except . . . [w]hen necessary to
correct errors in computation of the base and Contract Rents to
comply with the HUD requirements." 24 C.F.R. 882.408(d)(1)
(1998). Trafalgar invokes this language to correct one error, but
not the other. If this regulation required the agency "to correct
errors in computation. . . to comply with the HUD requirements,"
HUD would have to correct both errors. Such an argument undermines
Trafalgar's position because the contract rent "in effect" would
contain neither error. The end result of this argument is that the
contract rent "in effect" would be lower than that under which the
parties have been operating. It is therefore to Trafalgar's
advantage that we view the contract rent "in effect" to be the rent
under which the parties have been operating. Because HUD does not
dispute this construction of the language, we accept it as
governing here.
 2. Reduction of the Contract Rent. Having identified the
rent "in effect" as the status quo, we easily can dispose of the
contention that HUD violated 1437f(c)(2)(C) by reducing the
contract rent in effect. The contract rent in effect has been
neither reduced nor increased. The plain language barring
reductions does not require HUD to raise the contract rent in this
situation. "[I]t is reductions in rent that are expressly
proscribed by section [1437f](c)(2)(C)." Foxglenn, 35 F.3d at 950
(emphasis added). HUD's decision to keep the current contract
rents complied with the statute's plain language, and consequently
cannot be considered arbitrary and capricious. The district
court's decision to the contrary must be reversed.
C. Whether HUD inappropriately classified the SHARP funds as 
grants.
 In 1985 and 1987, Trafalgar entered into contracts to
receive more than $1 million over 15 years from the Massachusetts
SHARP program. In determining how the receipt of those funds
impacted Trafalgar's contract with HUD, HUD was required to
classify them as either a grant or a loan. If the SHARP funds were
grants, the HUD regulations would require Trafalgar to subtract the
amount from the debt service calculations, and it therefore would
not be included in the base rent. If the SHARP funds were loans,
the amounts would have been included in the debt service
calculation for the purposes of computing the base rents.
 The SHARP contracts have many of the indicia of loans. 
Indeed, the SHARP program's enabling legislation provides that the
financial assistance shall be "in the form of a loan." Mass. Gen.
Laws ch. 23B, 27. The Massachusetts Department of Housing and
Community Development ("DCHD") is empowered to determine the
appropriate annual amount of the "loan proceeds" to be distributed
to each project. Id. One of the restrictions on the DCHD's
authority is that the disbursement decisions must be "consistent
with the repayment of the loan as hereinafter provided." Id. The
repayment obligations may not be waived in whole or in part. Seeid. To guarantee that the loans are actually repaid, they are
secured by a lien on real or personal property, or both. See id.
 The contracts executed by Trafalgar and the Massachusetts
Housing Finance Agency ("MHFA"), the body overseeing the SHARP
program financing obligations, confirm these details. The
contracts provide that Trafalgar would receive "housing subsidy
loans" under the SHARP Program. (App. at 50). Paragraph 12 of the
contracts contains language highly relevant to the decision to
classify SHARP proceeds as a grant or loan:
 The parties specifically understand and agree
 that the SHARP funds provided by this Contract
 are considered to be a loan from the
 [Executive Office of Communities and
 Development ("EOCD")] to the [MHFA] and not a
 grant of money. The loan provided hereunder
 shall be evidenced by a Subsidy Repayment
 Note. . . . This Subsidy Repayment Note shall
 be, and hereby is, secured by the mortgage on
 the Project.

(App. at 55, 68). Three statements in this paragraph are relevant:
1) the parties acknowledged that this money was a loan "and not a
grant" from EOCD to MHFA, who then loaned it to Trafalgar; 2) the
loan was evidenced by a repayment note; and 3) the repayment
obligation was secured by a mortgage. 
 The attached "Subsidy Repayment Notes" stated that
Trafalgar would repay the MHFA the principal amount of the notes,
"together with simple interest thereon." (App. at 60, 74). 
Trafalgar was obliged to repay the principal and interest on
December 1, 2016, unless Trafalgar had defaulted on the loans or
sold the project prior to that date. While the notes were
expressly secondary to any existing mortgage on the property,
Trafalgar agreed to use any assets remaining after repaying the
mortgage to repay the notes, and agreed "to pay, in addition to
other amounts due, all reasonable legal charges and expenses
incurred for collecting the debt, including attorney's fees." 
(App. at 61, 75).
 Despite these indicators suggesting that the SHARP funds
were loans, HUD decided to classify them as grants for two reasons. 
First, HUD stated that the repayment obligations were not
sufficiently imminent because Trafalgar was not required to repay
any of the loan proceeds until December 1, 2016. HUD took the
position that base rents should not reflect costs that will not
come due during the term of the HAP; the HAP expired in the year
2002, fourteen years before the loan's due date. Second, HUD
stated that the SHARP obligations were not sufficiently certain to
justify inclusion in the base rents. Under the SHARP contracts,
Trafalgar's obligation to repay the principal and interest might be
altered. Trafalgar could "recycle" the principal into the project
by, for instance, providing the tenants with rent subsidies or a
credit toward the purchase of project units. Interest payments
could be forgiven if Trafalgar instituted a program to limit the
impact of the SHARP program termination on the low and moderate
income tenants. Because the principal could be recycled and the
interest forgiven, HUD found that the repayment obligations were
too uncertain to justify treatment as a loan and inclusion in the
contract rents.
 At first blush, these reasons seem rational, and perhaps
sufficient to survive review under the deferential arbitrary and
capricious standard. However, neither basis for HUD's decision
makes rational sense to this court, as the arbitrary and capricious
standard requires.
 1. Costs due after HAP termination. As stated earlier,
the base rent is designed to represent the cost of owning, managing
and maintaining the unit. In this case some of those costs have
been advanced by a third party. The fact that Trafalgar's
repayment obligations do not mature until after the conclusion of
the HAP contract does not mean that the principal and interest
payments are not costs of owning, managing and maintaining the
unit. HUD's argument could be used to exclude other significant
costs. For instance, Trafalgar might have purchased the property
by a mortgage with a single balloon payment due after the HAP term. 
In such a situation, HUD's argument would bar consideration of the
mortgage obligation, even though it clearly represents a cost of
owning, managing and maintaining the property. As the district
court stated, the fact that Trafalgar's repayment obligation
accrues well after the conclusion of the HAP term does not mean
that Trafalgar has "received a gift . . . and not a loan." 
Trafalgar Capital Assoc., 973 F. Supp. at 220. 
 HUD has recognized that the rehabilitation debt service
may include amounts to be paid by the project owner after the
conclusion of the HAP, specifically payment of a rehabilitation
loan whose term might extend beyond the 15-year HAP period. (SeeHUD Handbook, p. 17 (the proposal might include "a loan term longer
than 15 years (e.g. 30 years if a 30-year loan is obtained)"). The
agency does not exclude the rehabilitation costs being paid by such
a loan even though some principal might not be repaid until years
after the HAP has terminated. We see no basis for excluding from
base rent costs that are similarly financed in a long range manner. 
A balloon payment of principal and interest strikes us as
materially equivalent to the extended loan payments that HUD
routinely views as appropriate costs. HUD's argument that the
SHARP funds are a grant because they are repaid after HAP
termination is thus inconsistent with its other practices and, as
a result, unconvincing.
 2. Costs not sufficiently certain. The second reason HUD
gives for classification of the SHARP funds as a grant is the
possibility that the principal might be "recycled" into the
project, and the interest might be forgiven. This rationale is
equally unavailing.
 Under the SHARP statute, Trafalgar is required to submit
a proposal to Massachusetts to limit the impact of SHARP assistance
termination on low and moderate income tenants. As noted earlier,
such a proposal might involve using the SHARP principal to
subsidize the tenants' rents, or it might feature a credit to the
tenants toward the purchase of their unit. Whatever the form of
the proposal, Trafalgar's receipts would be less than they
otherwise would have been. Instead of paying the principal to
MHFA, Trafalgar effectively would be paying that amount to the
tenants.
 The direct recipient of Trafalgar's "repayment" is
immaterial for determining whether the SHARP funds are a grant or
a loan; if "recycling" occurs, Trafalgar suffers the same financial
loss as it would in repaying the loan directly to the MHFA. The
district court was correct when it stated that "[i]t is entirely
unreasonable to suggest that, because the eventual recipients of
[Trafalgar's] repayment are the tenants, . . . [Trafalgar] is not,
in reality, paying back the loan's principal." Trafalgar Capital
Assoc., 973 F. Supp. at 220.
 The fact that interest might be forgiven also does not
automatically mean that the SHARP funds become a grant rather than
a loan. As HUD well knows, any decision to reduce or waive the
interest is in the sole and exclusive discretion of MHFA, and "will
only be allowed if [Trafalgar] produces an exceptional plan for
helping low and moderate income families" transition from receiving
SHARP financial assistance to the termination of the SHARP program. 
(App. at 228)(emphasis added). Any future decision by MHFA to
waive the interest does not alter Trafalgar's current obligation to
pay interest on the principal it has received. In addition, even
if interest on the SHARP funds is waived in part or in whole, the
SHARP assistance would constitute either a low-interest or
interest-free loan, both of which are still loans. (See id.) If
the principal still must be repaid, the reduction or elimination of
interest does not convert a loan to a grant.
 In sum, then, it was not rational for HUD to classify the
SHARP funds as a grant rather than a loan. The SHARP contracts
have all the indicia of loans. They require repayment of the
principal and interest. They are secured by a lien on the
property. If Trafalgar does not fulfill its obligations, it agreed
to pay all legal costs, including attorney's fees, associated with
collection efforts. And the language in the contracts explicitly
states that they are loans and not grants. HUD's reasons for
classifying them as grants are not reasonable. The expense of
repaying the SHARP funds, although incurred after HAP termination,
is a cost of owning, managing and maintaining the property. 
Interest is forgiven only under the state's discretion, and, even
if it were forgiven, an interest-free loan is still a loan. We
therefore affirm the district court's ruling that HUD's decision to
classify the SHARP funds as a grant was arbitrary and capricious. 
D. Whether the statute of limitations bars Trafalgar's claim that
the 1986 FMR should have been used.
 The Fair Market Rent, or FMR, used in the AHAP and HAP
establishes the ceiling for the contract rents and therefore has a
significant impact on an owner's subsidy from HUD. Trafalgar
argues that HUD improperly used the 1985 FMR instead of the higher
1986 FMR, thereby reducing the funds to which Trafalgar was
entitled. The district court found this claim to be barred by the
statute of limitations, and Trafalgar challenges this decision on
cross-appeal. Application of the statute of limitations by
definition involves an appreciation of the dates involved, so our
analysis must start there.
 The FMR is based on the rents actually charged for units
in the same area, and the Secretary of HUD is required to establish
FMRs "periodically but not less than annually." 42 U.S.C. 
1437f(c)(1). On July 5, 1984, HUD first published the 1985 FMRs as
an interim rule with an effective date of October 1, 1984. The
1985 FMRs were published in final rule form on April 16, 1985.
 The AHAP was executed on April 30, 1986. In accordance
with the regulations, it specified that the initial contract rents
would be based on the FMRs then in effect, which were the 1985
rates. The 1986 FMR applicable to the project was published and
made effective on August 29, 1986, four months after AHAP
execution, and twenty-two months after the 1985 FMR had gone into
effect.
 On April 17, 1990, the parties executed the final stage
of the HAP contract. Trafalgar argued that the base and contract
rent ceilings should be based on the 1986 FMR, but HUD insisted on
using the 1985 rate. Trafalgar chose to pursue administrative
remedies, which were exhausted with HUD's final denial on April 7,
1995. 
 Trafalgar filed its claim in the district court on June
15, 1995. It argued that, consistent with the statutory
requirement, the 1986 FMRs should have been established by October
1, 1985, one year after the 1985 FMRs went into effect. Had HUD
followed the statutory mandate to set the FMRs no less than
annually, the AHAP and HAP would have used the 1986 FMRs.
 A complaint under the APA for review of an agency action
is a civil action that must be filed within the six year
limitations period set forth in 28 U.S.C. 2401(a). See, e.g.,
Daingerfield Island Protective Society v. Babbitt, 40 F.3d 442, 445
(D.C. Cir. 1994); Wind River Mining Corp. v. United States, 946
F.2d 710, 712 (9th Cir. 1990). The only two relevant actions
within six years of the June 15, 1995 filing of the complaint are
the HAP execution on April 17, 1990, and the conclusion of
administrative appeals on April 7, 1995. Appreciating this fact,
Trafalgar argues that the claim did not accrue either until the HAP
was executed or until Trafalgar had exhausted its administrative
remedies. In its decision that Trafalgar's claim was barred by the
statute of limitations, the district court implicitly rejected
Trafalgar's first argument, and explicitly rejected the second.
 1. HAP execution. In general, "[a] cause of action
against an administrative agency 'first accrues,' within the
meaning of 2401(a), as soon as . . . the person challenging the
agency action can institute and maintain a suit in court." Spannusv. DOJ, 824 F.2d 52, 56 (D.C. Cir. 1987). Under the APA, the
injured party can maintain a suit once the agency has issued a
"final agency action." 5 U.S.C. 704; see, e.g., Sierra Club v.
Slater, 120 F.3d 623, 631 (6th Cir. 1997); Dunn-McCampbell Royalty
Interest, Inc. v. National Park Serv., 112 F.3d 1283, 1287 (5th
Cir. 1997). In determining whether a particular agency action is
final, "[t]he core question is whether the agency has completed its
decisionmaking process, and whether the result of that process is
one that will directly affect the parties." Franklin v.
Massachusetts, 505 U.S. 788, 797 (1992). To be a "final agency
action," it must be a "definitive statement[ ] of [the agency's]
position" with "direct and immediate" consequences. FTC v.
Standard Oil Co., 449 U.S. 232, 241 (1980).
 Determining which HUD statement was the final agency
action is a relatively straightforward exercise. HUD regulations
require that initial rents are capped at the FMR "applicable to the
unit on the date that the [AHAP] is executed." 24 C.F.R. 
882.408(c) (1998). This limit applies to both the AHAP and HAP,
even though payments do not commence until rehabilitation has been
completed and the parties have executed the HAP, which may be well
after the date of the AHAP. Therefore, the final agency action for
the purpose of commencing the statute of limitations was the final
statement by HUD setting the FMR that applied on the date of AHAP
execution.
 The 1985 FMR was in effect at the time of AHAP execution
on April 30, 1986. Although HUD should have promulgated the 1986
FMRs by that time, HUD followed the regulation requirement to apply
the FMR then in effect. A strong argument can be made that AHAP
execution was the final agency action for the purpose of commencing
the statute of limitations.
 However, one could also argue that the final agency
action did not occur until HUD actually issued the 1986 FMR on
August 29, 1986. On that date, at the latest, Trafalgar learned
that HUD would not apply the new rate to its previously executed
AHAP. Prior to that date, Trafalgar had a possible argument that
the 1986 FMR, which reflected rates as of April 1, could be applied
retroactively to the AHAP executed April 30.
 Deciding which of these decisions was the final agency
action is unnecessary, because both occurred well outside the
statute of limitations. Even if the issuance of the 1986 FMR were
the final agency action, rather than AHAP execution, Trafalgar
would have been required to file its action in court before August
29, 1992, six years later. Trafalgar's complaint was not filed
until June 15, 1995, almost three years after the expiration of the
statute of limitations.
 Trafalgar argues that the HAP was the final agency
decision because HUD could change the terms of the contract between
the AHAP and HAP. The relevant regulation allows HUD to change the
contract rent between the AHAP and HAP under certain limited
circumstances: unexpected changes in rehabilitation costs, changes
in financing, changes in relocation payments to tenants, or to
correct errors in computation. See 24 C.F.R. 882.408(d)(1)
(1998). None of these situations applies. Moreover, the
regulations specifically require application of the FMR applicable
on the date of the execution of the AHAP. HUD's issuance of the
1986 FMR was therefore the final agency action with respect to
Trafalgar's claim.
 2. Exhaustion of administrative remedies. In the
alternative, Trafalgar alleges that the cause of action did not
accrue until it had exhausted all available administrative
remedies. The district court rejected this argument, ruling that
Trafalgar's decision to pursue administrative remedies not
explicitly a prerequisite to suit did not affect the accrual of its
claim. 
 The Supreme Court has held that "no one is entitled to
judicial relief for a supposed or threatened injury until the
prescribed administrative remedy has been exhausted." Myers v.
Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51 (1938). "In
practice, the doctrine has softer edges than this language
implies." Portela-Gonzalez v. Secretary of the Navy, 109 F.3d 74,
77 (1st Cir. 1997). When Congress explicitly requires that
administrative remedies must be pursued before seeking judicial
relief, litigants must obviously follow that mandate. See Coit
Independence Joint Venture v. FSLIC, 489 U.S. 561, 579 (1989). On
the other hand, "where Congress has not clearly required
exhaustion, sound judicial discretion governs." McCarthy v.
Madigan, 503 U.S. 140, 144 (1992). 
 While most of the decisions regarding administrative
remedies involve whether the litigant has filed suit too early,
i.e., before exhaustion of administrative remedies, this case
involves the opposite question. We must consider whether or when
a party that does pursue administrative remedies before filing suit
is barred for untimeliness. 
 In this latter event, it makes a difference whether the
administrative route is mandatory, i.e., a condition precedent to
suit, or permissive, i.e., permitted but not required as a
condition precedent. In the former situation, the cause of action
does not accrue until the completion of the required administrative
proceedings. See Crown Coat Front Co. v. United States, 386 U.S.
503, 522 (1967); United States v. Suntip Co., 82 F.3d 1468, 1475
(9th Cir. 1996); United States v. Gordon, 78 F.3d 781, 786 (2d Cir.
1996). In the latter situation, the cause of action accrues at the
time of the injury. See Unexcelled Chemical Corp. v. United
States, 345 U.S. 59, 65 (1953); Brighton Village Assoc. v. United
States, 52 F.3d 1056, 1060 (Fed. Cir. 1995). Trafalgar has
throughout its briefings consistently ignored this contrast, which
we specifically recognized in United States v. Meyer, 808 F.2d 912
(1st Cir. 1987).
 The district court correctly recognized this distinction
in holding that Trafalgar's claim accrued before it began to seek
permissive administrative remedies. Trafalgar was entitled to
pursue administrative remedies, but its choice to do so did not
stop the statute of limitations from running.
 III. Conclusion
 We reverse the district court's determination that HUD
acted in an arbitrary and capricious manner in excluding the pre-
AHAP costs from the base rents and in maintaining the status quo
when offsetting mistakes were made. The district court, however,
correctly concluded that HUD was arbitrary and capricious in
treating the SHARP funds as a grant instead of a loan. Trafalgar's
claim to use a different year FMR was time-barred, as the district
court appropriately found. 
 Accordingly, the district court's judgment is affirmed in
part and reversed in part. HUD to receive half its costs.