159 F.3d 21
 TRAFALGAR CAPITAL ASSOCIATES, INC., Etc., Plaintiff, Appellee,
v.
Andrew CUOMO, Etc., Defendant, Appellant,
Executive Office of Communities and Development, et al.,
Defendants, Appellees.
TRAFALGAR CAPITAL ASSOCIATES, INC., Etc., Plaintiff, Appellant,
v.
Andrew CUOMO, Etc., et al., Defendants, Appellees.
 Nos. 97-2152, 97-2153.
 United States Court of Appeals,
First Circuit.
 Heard Sept. 16, 1998.
Decided Oct. 29, 1998.
Rehearing and Suggestion for Rehearing En Banc Denied Dec. 30, 1998.
 
 Maria Simon, Attorney, Appellate Staff, with whom Frank W. Hunger, Assistant Attorney General, Donald K. Stern, United States Attorney, and John F. Daly, Attorney, Appellate Staff, were on brief for Andrew Cuomo, Etc.
 Carl A.S. Coan, Jr., with whom Carl A.S. Coan III, was on brief for Trafalgar Capital Associates, Inc.
 Before SELYA, Circuit Judge, ALDRICH and COFFIN, Senior Circuit Judges.
 COFFIN, Senior Circuit Judge.
 
 
 1
 The United States Department of Housing and Urban Development ("HUD") agreed to subsidize a portion of tenants' rents in a housing rehabilitation project owned by the Heywood-Wakefield Associates Limited Partnership ("Heywood-Wakefield"). Appellee/cross-appellant Trafalgar Capital Associates, Inc. ("Trafalgar"), the general partner of Heywood-Wakefield,[1] complained that HUD miscalculated the amounts to which the project was entitled. Upon cross-motions for summary judgment, the district court found that three decisions by HUD were arbitrary and capricious and that Trafalgar's claim on a fourth HUD decision was barred by the statute of limitations. We hold that the district court erred on two of the claims, but correctly ruled for HUD on the third and on the statute of limitations. We accordingly affirm in part, and reverse in part.I. Background
 
 A. Statutory Scheme
 
 2
 HUD agreed to subsidize Trafalgar's project under the Moderate Rehabilitation Program, 42 U.S.C. § 1437f(e)(2), one of the programs under Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f ("Section 8").[2] The Moderate Rehabilitation Program is designed to encourage private individuals to rehabilitate low and moderate income housing through the award of rent subsidies. Under the program, HUD contracts with local public housing agencies, which in turn contract with the project owners who rehabilitate the property. Regulations require the local public housing agency to secure a preliminary contract with the project owner prior to rehabilitation, and a permanent agreement once the rehabilitation is completed and the units are ready for occupancy.
 
 
 3
 Both the preliminary agreement, known as the "AHAP," or Agreement to Enter into a Housing Assistance Payments contract, and the permanent agreement, known as the "HAP," or Housing Assistance Payments contract, set a "contract rent" based on the applicable regulations. See 24 C.F.R. § 882.408 (1998). Residents eligible for Section 8 housing are required to pay rent based on their monthly income. See 42 U.S.C. § 1437a(a). HUD pays the owner the difference between the "contract rent" and the amount the resident pays. See 42 U.S.C. § 1437f(c)(3)(A).
 
 
 4
 The contract rent is based on two components: 1) the "monthly rehabilitation debt service," which covers the cost of rehabilitation; and 2) the "base rent," reflecting the cost of owning, managing, and maintaining the property independent of rehabilitation costs. See 24 C.F.R. § 882.408(c)(2) (1998). The base rent is also allowed to incorporate a reasonable return on investment. HUD Handbook 7420.3 ("HUD Handbook"), p. 2. Both the base rent component and the contract rent total are subject to market-based ceilings, and are adjusted annually.[3] See 42 U.S.C. § 1437f(c); 24 C.F.R. § 882.410(a)(1) (1998). The base rent is ordinarily capped at the Existing Housing Fair Market Rent ("FMR"), and the contract rent has a ceiling of 120 percent of the relevant FMR. See 42 U.S.C. § 1437f(c); 24 C.F.R. § 882.408(a) (1998). FMRs, published annually by HUD, are based on an analysis of the rents charged for similar standard units in the same general geographic region. See 42 U.S.C. § 1437f(c).
 
 
 5
 In certain situations HUD can approve increases for costs not sufficiently taken into account in the contract rent calculation. An "exception rent" may be granted if the FMR does not accurately reflect the actual rents charged in the project's "specified area," meaning its more narrowly defined geographic region. See 24 C.F.R. § 882.408(b) (1998), HUD Handbook, Ch. 10, 10-2(c)(1). If HUD approves such an exception rent, the owner may charge an additional 10 percent over the usual contract rent ceiling. See 24 C.F.R. § 882.408(b) (1998).
 
 B. Facts
 
 6
 In February 1984, Trafalgar filed its proposal with HUD to convert an abandoned furniture factory in Gardner, Massachusetts into moderate income housing. The preliminary AHAP for the project was executed on April 30, 1986, with a retroactive effective date of February 8, 1986. The rehabilitation proceeded in four stages. After the fourth stage was completed, the final portion of the permanent HAP was executed on April 17, 1990.
 
 
 7
 Trafalgar also has a contract in connection with the same project to receive more than $1.1 million in assistance over 15 years from a state program known as the Massachusetts State Housing Assistance for Rental Production ("SHARP") program.
 
 
 8
 Trafalgar believed that HUD made several incorrect decisions that had the effect of reducing the subsidies to which Trafalgar was entitled. After lengthy correspondence and proposals to revise the HAP, Trafalgar brought this action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-59, 701-6, and the Declaratory Judgment Act, 28 U.S.C. § 2201. Trafalgar's complaint charged four errors: (1) HUD erroneously excluded costs incurred before the AHAP; (2) HUD improperly refused to raise the contract rent after offsetting errors were discovered; (3) HUD mistakenly characterized the Massachusetts SHARP assistance as a grant rather than a loan; and (4) HUD incorrectly used the 1985 FMR instead of the 1986 FMR. Upon cross-motions for summary judgment, the district court ruled that HUD's decisions on the first three issues were arbitrary and capricious, but that Trafalgar's claim on the fourth was barred by the statute of limitations. Both parties appealed.
 
 
 9
 Additional facts will be developed in subsequent sections as they become relevant.
 
 II. Discussion
 
 10
 This court reviews the district court's grant of summary judgment de novo, viewing the facts in the light most favorable to the non-moving party. See FDIC v. Kane, 148 F.3d 36, 38 (1st Cir.1998). We can affirm only if "the record discloses no trialworthy issue of material fact and the moving party is entitled to judgment as a matter of law." EEOC v. Green, 76 F.3d 19, 23 (1st Cir.1996).
 
 
 11
 With respect to the three HUD decisions, they can only be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When exposed to judicial review, HUD's decisions are entitled to "great deference" and are presumed valid. Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 109 (1st Cir.1997). The court must affirm HUD's decisions if they are "reasoned, and supported by substantial evidence in the record." Id. "Although searching and careful, review under the 'arbitrary and capricious' standard is narrow in scope." Pan American Grain Mfg. Co. v. E.P.A., 95 F.3d 101, 103 (1st Cir.1996). The court may not substitute its judgment for that of the agency, and agency decisions will be upheld so long as they "do not collide directly with substantive statutory commands and so long as procedural corners are squarely turned." Adams v. E.P.A., 38 F.3d 43, 49 (1st Cir.1994). The court's deference to HUD's decisions "is magnified when the agency interprets its own regulations." Puerto Rico Aqueduct & Sewer Auth. v. E.P.A., 35 F.3d 600, 604 (1st Cir.1994). While this standard of review is highly deferential, "it is not a rubber stamp." Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n, 59 F.3d 284, 290 (1st Cir.1995). To avoid being found arbitrary and capricious, HUD's decision must be rational; that is it "must make sense to [the] reviewing court[ ]." Puerto Rico Sun Oil Co. v. E.P.A., 8 F.3d 73, 77 (1st Cir.1993).
 
 
 12
 Whether the statute of limitations barred Trafalgar's claim regarding the relevant FMR is an issue of law, and that aspect of the district court's decision will be reviewed de novo. See American Airlines, Inc. v. Cardoza-Rodriguez, 133 F.3d 111, 125 (1st Cir.1998).
 
 
 13
 A. Whether HUD improperly excluded costs incurred before February 8, 1985 from the rent calculation.
 
 
 14
 Although HUD regulations require that the parties execute an AHAP before the owner begins rehabilitation, see 24 C.F.R. § 882.505 (1998), Trafalgar started work before executing such an agreement. When the public housing agency overseeing rehabilitation learned of Trafalgar's failure to enter into the AHAP, it ordered rehabilitation halted, and a meeting was called on February 5, 1986. At that meeting the parties agreed to execute an AHAP, which they finally did on April 30, 1986. Because it was clear that the AHAP would be executed, and the parties wanted rehabilitation to continue, they agreed at the meeting to backdate the AHAP to February 8, 1986, three days hence.
 
 
 15
 Between the date the proposal was submitted and February 8, 1986, Trafalgar had spent about $1.6 million on rehabilitation. At the February 5 meeting the parties discussed how these funds might be incorporated into the amounts Trafalgar could recover from HUD, but they evidently did not settle the specific method for doing so.[4] HUD, however, later determined that regulations barred including the $1.6 million in the subsidy calculations. The district court ruled that HUD's apparent reversal was arbitrary and capricious. Our review persuades us to the contrary.
 
 
 16
 It is undisputed that Trafalgar's pre-AHAP costs could only be incorporated into the base rent section of the contract rent because the monthly rehabilitation debt service may include only the rehabilitation costs incurred after the AHAP's effective date. Trafalgar argues that the amount should be allowed under either of two different sub-parts of base rent: the property debt service or return on investment. HUD argues that the structure and language of the regulations prohibit it from including the disputed costs in either category. We consider each possibility in turn.
 
 
 17
 1. Property Debt Service. HUD denied Trafalgar's request that the expenses be included in the property debt service on the ground that that component is temporally limited to costs incurred before the project proposal is submitted to HUD. Trafalgar argues that the regulations and HUD Handbook impose no such limitation. Each side cites language in the HUD Handbook to support its position.
 
 
 18
 The Handbook sets forth detailed guidelines to which HUD must adhere in setting the terms of an AHAP and a HAP. It includes a form for calculating the base and contract rents, as well as extensive instructions on how to complete the form. HUD points to the "property debt service" instructions, which require the owner to "[e]nter the annual principal and interest (P & I) payments for loans related to purchase and improvement of the property at the date of proposal submittal." HUD Handbook, p. 9 (emphasis omitted and added).
 
 
 19
 Trafalgar, in response, looks to the general overview language, which states that the base rent should reflect the "[a]nnual expenses for property debt service, insurance, taxes, utilities, management, and maintenance, projected to the date of HAP contract execution." HUD Handbook, p. 2 (emphasis added). However, Trafalgar neglects to mention that the Handbook describes this overview as a "brief summary," and notes that "[d]etailed instructions are contained in the rent calculation formats." Id. The fact that the overview language states that a variety of costs should be calculated to the date of the HAP contract execution does not alter Trafalgar's obligation to comply with the specific instructions on how those calculations are to be performed. As HUD recognizes, the provision allowing for annual expenses to be "projected to the date of HAP contract execution," is HUD's method of acknowledging that estimated increases in operating costs should be included.[5] The provision does not authorize inclusion of rehabilitation costs, or any other costs not otherwise within the instructions for property debt service.
 
 
 20
 The well-known canon of statutory construction that the specific governs the general dictates the same result. See Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384-85, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992); Lloyd v. FDIC, 22 F.3d 335, 337 (1st Cir.1994). The specific limitation that property debt service includes only costs prior to proposal submission trumps the general language that the costs should be calculated through the date of HAP execution.
 
 
 21
 Not only the Handbook's language but also the logic of the subsidy program supports HUD's position. In essence Trafalgar argues that the $1.6 million is recoverable as part of the property debt service regardless of when it was spent. This approach would justify inclusion of the same costs in two parts of the contract rent. If Trafalgar had followed the HUD regulations and executed an AHAP prior to beginning rehabilitation, the costs would have been includable in the monthly rehabilitation debt service component. Its argument here is that they are also recoverable under the property debt service sub-part of base rent. Trafalgar's argument assumes a redundancy in the Handbook, and deprives the distinction between rehabilitation debt service and base rent of any sense. The structure of the subsidy calculations confirms the conclusion that Trafalgar is not entitled to recover these pre-AHAP rehabilitation costs as part of the property debt service.
 
 
 22
 2. Return on Investment. The only other possible method for recovering these costs is including them as part of "an adequate return on the owner's investment." HUD Handbook, p. 2. In general, return on investment is limited in the same manner as the property debt service: it is capped at "the owner's actual cash equity in the property at the time of proposal submission." HUD Handbook, p. 13 (emphasis added). However, the notes detailing how to calculate return on investment create a narrow exception for post-proposal, pre-AHAP investment.
 
 
 23
 Under the Handbook the return on investment element may include post-proposal costs if two conditions are met: 1) a "prolonged period [must have] elapsed between proposal submission and [AHAP] execution;" and 2) consistent with other requests for return on investment, the costs must be expended from "actual cash equity." HUD Handbook, p. 13. Actual cash equity is defined as the cost of capital expenditures less the outstanding indebtedness. See id. Taking these provisions together, the owner may capture an adequate return on investment for rehabilitation undertaken only through capital expenditures, not through borrowed funds, and only if there was a prolonged delay between proposal and AHAP.
 
 
 24
 HUD determined that Trafalgar's post-proposal, pre-AHAP costs could not be included in a return on investment request, despite its meeting the prolonged period element, because Trafalgar failed to meet the actual cash equity requirement. The $1.6 million was expended from borrowed funds, not owner capital. Trafalgar argues that differentiating between actual cash equity and financed funds for the purposes of return on investment is arbitrary and capricious.
 
 
 25
 In our view, limiting return on investment to capital expenditures is fully supportable. HUD recognizes that the larger costs, such as the cost of acquiring the property, could either be financed or paid out of owner capital, and has established a scheme to deal with each scenario. For financed costs, HUD allows the owner to be repaid the principal and interest through property debt service. For large costs paid from owner capital, HUD allows the owner to recoup the expenditure plus a reasonable "return on investment." In theory then, owners are repaid any borrowed costs through property debt service and any capital expenditures through return on investment.[6] Under this scheme, it is not arbitrary and capricious to restrict property debt service to outstanding indebtedness, and limit return on investment to actual cash equity.
 
 
 26
 The problem for Trafalgar is that it incurred rehabilitation expenses earlier than it should have. Had Trafalgar complied with HUD regulations and executed an AHAP before commencing rehabilitation, see 24 C.F.R. § 882.505 (1998), its costs would have been incorporated into rehabilitation debt service. Although the parties discussed the possibility of including pre-AHAP costs in base rent, the HUD Handbook, available to Trafalgar at the time, provides for return on investment only if the two conditions are met. HUD's ultimate decision to follow its Handbook in dealing with the situation once it understood that Trafalgar could not comply with both conditions was "reasoned and supported by substantial evidence in the record." Associated Fisheries, 127 F.3d at 109. In fact, a decision to allow Trafalgar to recover these costs, contrary to the regulations and the HUD Handbook, might have provoked criticism that HUD was acting arbitrarily and capriciously by inconsistently applying its own policies.
 
 
 27
 We therefore conclude that HUD appropriately denied Trafalgar's request to include the $1.6 million in base rent. HUD's regulations reasonably barred incorporating these costs in either the property debt service component or return on investment allowance, and the agency's decision to follow those regulations cannot be termed arbitrary or capricious. The district court's finding to the contrary must be reversed.
 
 
 28
 B. Whether HUD inappropriately refused to raise the contract rents after two errors were discovered.
 
 
 29
 In the HAP, HUD made two errors in calculating the contract rent, one to Trafalgar's detriment and the other to its benefit. HUD refused to remedy the error that disadvantaged Trafalgar because this error was more than offset by the mistake to Trafalgar's benefit. The district court found HUD's decision to maintain the status quo arbitrary and capricious. We disagree.
 
 
 30
 On September 24, 1984, the public housing agency sponsoring the project requested an "exception rent," allowing for a 10 percent increase in the contract rent ceiling. Under the regulations, an exception rent is appropriate only when the rate otherwise applicable does not accurately reflect the rents being charged in the project's specific geographic area. See 24 C.F.R. § 882.408(b) (1998). HUD's Boston Regional Office initially denied the request, and Trafalgar appealed the denial to the Assistant Secretary for Housing. Before HUD headquarters had decided the appeal, however, the Regional Administrator reassessed the situation, reversed the earlier decision, and erroneously agreed to allow Trafalgar to charge an exception rent.[7] The very next day, HUD headquarters, unaware of the Regional Director's new decision, affirmed the earlier denial of an exception rent. Since the Regional Administrator had approved the request, the HAP included the erroneous exception rent, to Trafalgar's benefit.
 
 
 31
 The other error in the HAP stemmed from HUD's application of the wrong debt service constant, which had the effect of reducing the contract rent, thereby limiting how much Trafalgar could recoup from HUD. HUD has conceded it made this debt service error and that it negatively impacted Trafalgar's payment from HUD.
 
 
 32
 When the debt service error was discovered in 1992, Trafalgar requested a correction. As a result of this request, HUD was required to recalculate the contract rent, and, in the course of doing so, realized the error in allowing Trafalgar to charge an exception rent. HUD decided that the most appropriate course of action would be to correct all errors.
 
 
 33
 The exception rent error, accruing to Trafalgar's benefit, was greater than the debt service error, to its detriment. Correction of both errors would therefore end up lowering, rather than raising, the contract rent, and would reduce the amounts Trafalgar would receive from HUD. An amendment to the Moderate Rehabilitation Program statute prohibits HUD from reducing the contract rents in effect on or after April 15, 1987, see 42 U.S.C. § 1437f(c)(2)(C), except when the property is refinanced and the owner's debt costs are decreased. Since the correction of both errors would have resulted in reducing the contract rent in violation of the statute, HUD chose to maintain the status quo with the two errors.
 
 
 34
 Upon cross-motions for summary judgment, the district court separated the two errors. Addressing the debt service mistake first, the court found that HUD was required to make a correction. In support of this decision, the court emphasized the language of paragraph 1.5 of the HAP, which states that contract rents "are subject to post-audit and change in accordance with HUD requirements, including the correction of errors in computation." Trafalgar Capital Assoc., Inc. v. Cisneros, 973 F.Supp. 214, 221 (D.Mass.1997) (quoting HAP, p 1.5). The district court found this mistake to be an error in computation that had to be corrected in accordance with that paragraph's mandate. See id. Having found that HUD was required to correct the debt service constant, the district court went on to consider the exception rent mistake. It determined that correcting that error would result in a reduction contrary to § 1437f(c)(2)(C)'s mandate. The net result of the district court's ruling left HUD correcting the debt service error, but Trafalgar continuing to benefit from the exception rent error.
 
 
 35
 HUD argues on appeal that it was entitled to offset the errors and that, because the net result would disadvantage Trafalgar, it could maintain the status quo in order to comply with the statutory prohibition against reducing the contract rents.[8] Trafalgar argues that failure to correct the debt service error causes a de facto reduction because using the correct debt service constant would have produced a higher contract rent.
 
 
 36
 To determine whether HUD's decision to maintain the status quo was legitimate, we look to the anti-reduction provision of the statute. The "starting point for interpretation of a statute 'is the language of the statute itself.' " Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 835, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990) (quoting Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980)); see Arnold v. United Parcel Service, Inc., 136 F.3d 854, 857-58 (1st Cir.1998). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron USA Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If the statutory text and congressional intent are ambiguous, HUD's interpretation is entitled to deference if it is reasonable. See id. at 844-45, 104 S.Ct. 2778.
 
 The statute provides:
 
 37
 The Secretary may not reduce the contract rents in effect on or after April 15, 1987, for newly constructed, substantially rehabilitated, or moderately rehabilitated projects assisted under this section (including projects assisted under this section as in effect prior to November 30, 1983), unless the project has been refinanced in a manner that reduces the periodic payments of the owner.
 
 
 38
 42 U.S.C. § 1437f(c)(2)(C). We first must determine what contract rent was "in effect," and then must assess whether HUD's decision to maintain the error-riddled status quo reduced that rent in violation of the statute.
 
 
 39
 1. Contract Rent In Effect. The only contract rent used by the parties is the erroneous rent set in the HAP in 1990. Trafalgar argues that that contract rent was not "in effect" within the meaning of the statute, because the regulations require HUD to raise the contract rent to correct the debt service error. Trafalgar maintains that, therefore, "by law, the increased 'contract rents' were 'in effect' and HUD's refusal to raise the [contract rents accordingly] constituted a de facto reduction ... in violation of 42 U.S.C.A. § 1437f(c)(2)(C)." (Brief for appellee/cross-appellant, p. 25).
 
 
 40
 The regulation on which Trafalgar relies provides that the "initial Contract Rents ... will be the Contract Rents on the effective date of the [HAP] except ... [w]hen necessary to correct errors in computation of the base and Contract Rents to comply with the HUD requirements." 24 C.F.R. § 882.408(d)(1) (1998). Trafalgar invokes this language to correct one error, but not the other. If this regulation required the agency "to correct errors in computation ... to comply with the HUD requirements,"[9] HUD would have to correct both errors. Such an argument undermines Trafalgar's position because the contract rent "in effect" would contain neither error. The end result of this argument is that the contract rent "in effect" would be lower than that under which the parties have been operating. It is therefore to Trafalgar's advantage that we view the contract rent "in effect" to be the rent under which the parties have been operating. Because HUD does not dispute this construction of the language, we accept it as governing here.
 
 
 41
 2. Reduction of the Contract Rent. Having identified the rent "in effect" as the status quo, we easily can dispose of the contention that HUD violated § 1437f(c)(2)(C) by reducing the contract rent in effect. The contract rent in effect has been neither reduced nor increased. The plain language barring reductions does not require HUD to raise the contract rent in this situation. "[I]t is reductions in rent that are expressly proscribed by section [1437f](c)(2)(C)." Foxglenn, 35 F.3d at 950 (emphasis added). HUD's decision to keep the current contract rents complied with the statute's plain language, and consequently cannot be considered arbitrary and capricious. The district court's decision to the contrary must be reversed.
 
 
 42
 C. Whether HUD inappropriately classified the SHARP funds as grants.
 
 
 43
 In 1985 and 1987, Trafalgar entered into contracts to receive more than $1 million over 15 years from the Massachusetts SHARP program. In determining how the receipt of those funds impacted Trafalgar's contract with HUD, HUD was required to classify them as either a grant or a loan. If the SHARP funds were grants, the HUD regulations would require Trafalgar to subtract the amount from the debt service calculations, and it therefore would not be included in the base rent. If the SHARP funds were loans, the amounts would have been included in the debt service calculation for the purposes of computing the base rents.
 
 
 44
 The SHARP contracts have many of the indicia of loans. Indeed, the SHARP program's enabling legislation provides that the financial assistance shall be "in the form of a loan." Mass. Gen. Laws ch. 23B, § 27. The Massachusetts Department of Housing and Community Development ("DCHD") is empowered to determine the appropriate annual amount of the "loan proceeds" to be distributed to each project. Id. One of the restrictions on the DCHD's authority is that the disbursement decisions must be "consistent with the repayment of the loan as hereinafter provided." Id. The repayment obligations may not be waived in whole or in part. See id. To guarantee that the loans are actually repaid, they are secured by a lien on real or personal property, or both. See id.
 
 
 45
 The contracts executed by Trafalgar and the Massachusetts Housing Finance Agency ("MHFA"), the body overseeing the SHARP program financing obligations, confirm these details. The contracts provide that Trafalgar would receive "housing subsidy loans" under the SHARP Program. (App. at 50). Paragraph 12 of the contracts contains language highly relevant to the decision to classify SHARP proceeds as a grant or loan:
 
 
 46
 The parties specifically understand and agree that the SHARP funds provided by this Contract are considered to be a loan from the [Executive Office of Communities and Development ("EOCD") ] to the [MHFA] and not a grant of money. The loan provided hereunder shall be evidenced by a Subsidy Repayment Note.... This Subsidy Repayment Note shall be, and hereby is, secured by the mortgage on the Project.
 
 
 47
 (App. at 55, 68). Three statements in this paragraph are relevant: 1) the parties acknowledged that this money was a loan "and not a grant" from EOCD to MHFA, who then loaned it to Trafalgar; 2) the loan was evidenced by a repayment note; and 3) the repayment obligation was secured by a mortgage.
 
 
 48
 The attached "Subsidy Repayment Notes" stated that Trafalgar would repay the MHFA the principal amount of the notes, "together with simple interest thereon." (App. at 60, 74). Trafalgar was obliged to repay the principal and interest on December 1, 2016, unless Trafalgar had defaulted on the loans or sold the project prior to that date. While the notes were expressly secondary to any existing mortgage on the property, Trafalgar agreed to use any assets remaining after repaying the mortgage to repay the notes, and agreed "to pay, in addition to other amounts due, all reasonable legal charges and expenses incurred for collecting the debt, including attorney's fees." (App. at 61, 75).
 
 
 49
 Despite these indicators suggesting that the SHARP funds were loans, HUD decided to classify them as grants for two reasons. First, HUD stated that the repayment obligations were not sufficiently imminent because Trafalgar was not required to repay any of the loan proceeds until December 1, 2016. HUD took the position that base rents should not reflect costs that will not come due during the term of the HAP; the HAP expired in the year 2002, fourteen years before the loan's due date. Second, HUD stated that the SHARP obligations were not sufficiently certain to justify inclusion in the base rents. Under the SHARP contracts, Trafalgar's obligation to repay the principal and interest might be altered. Trafalgar could "recycle" the principal into the project by, for instance, providing the tenants with rent subsidies or a credit toward the purchase of project units. Interest payments could be forgiven if Trafalgar instituted a program to limit the impact of the SHARP program termination on the low and moderate income tenants. Because the principal could be recycled and the interest forgiven, HUD found that the repayment obligations were too uncertain to justify treatment as a loan and inclusion in the contract rents.
 
 
 50
 At first blush, these reasons seem rational, and perhaps sufficient to survive review under the deferential arbitrary and capricious standard. However, neither basis for HUD's decision makes rational sense to this court, as the arbitrary and capricious standard requires.
 
 
 51
 1. Costs due after HAP termination. As stated earlier, the base rent is designed to represent the cost of owning, managing and maintaining the unit. In this case some of those costs have been advanced by a third party. The fact that Trafalgar's repayment obligations do not mature until after the conclusion of the HAP contract does not mean that the principal and interest payments are not costs of owning, managing and maintaining the unit. HUD's argument could be used to exclude other significant costs. For instance, Trafalgar might have purchased the property by a mortgage with a single balloon payment due after the HAP term. In such a situation, HUD's argument would bar consideration of the mortgage obligation, even though it clearly represents a cost of owning, managing and maintaining the property. As the district court stated, the fact that Trafalgar's repayment obligation accrues well after the conclusion of the HAP term does not mean that Trafalgar has "received a gift ... and not a loan." Trafalgar Capital Assoc., 973 F.Supp. at 220.
 
 
 52
 HUD has recognized that the rehabilitation debt service may include amounts to be paid by the project owner after the conclusion of the HAP, specifically payment of a rehabilitation loan whose term might extend beyond the 15-year HAP period. (See HUD Handbook, p. 17 (the proposal might include "a loan term longer than 15 years (e.g. 30 years if a 30-year loan is obtained))"). The agency does not exclude the rehabilitation costs being paid by such a loan even though some principal might not be repaid until years after the HAP has terminated. We see no basis for excluding from base rent costs that are similarly financed in a long range manner. A balloon payment of principal and interest strikes us as materially equivalent to the extended loan payments that HUD routinely views as appropriate costs. HUD's argument that the SHARP funds are a grant because they are repaid after HAP termination is thus inconsistent with its other practices and, as a result, unconvincing.
 
 
 53
 2. Costs not sufficiently certain. The second reason HUD gives for classification of the SHARP funds as a grant is the possibility that the principal might be "recycled" into the project, and the interest might be forgiven. This rationale is equally unavailing.
 
 
 54
 Under the SHARP statute, Trafalgar is required to submit a proposal to Massachusetts to limit the impact of SHARP assistance termination on low and moderate income tenants. As noted earlier, such a proposal might involve using the SHARP principal to subsidize the tenants' rents, or it might feature a credit to the tenants toward the purchase of their unit. Whatever the form of the proposal, Trafalgar's receipts would be less than they otherwise would have been. Instead of paying the principal to MHFA, Trafalgar effectively would be paying that amount to the tenants.
 
 
 55
 The direct recipient of Trafalgar's "repayment" is immaterial for determining whether the SHARP funds are a grant or a loan; if "recycling" occurs, Trafalgar suffers the same financial loss as it would in repaying the loan directly to the MHFA. The district court was correct when it stated that "[i]t is entirely unreasonable to suggest that, because the eventual recipients of [Trafalgar's] repayment are the tenants, ... [Trafalgar] is not, in reality, paying back the loan's principal." Trafalgar Capital Assoc., 973 F.Supp. at 220.
 
 
 56
 The fact that interest might be forgiven also does not automatically mean that the SHARP funds become a grant rather than a loan. As HUD well knows, any decision to reduce or waive the interest is in the sole and exclusive discretion of MHFA, and "will only be allowed if [Trafalgar] produces an exceptional plan for helping low and moderate income families" transition from receiving SHARP financial assistance to the termination of the SHARP program. (App. at 228)(emphasis added). Any future decision by MHFA to waive the interest does not alter Trafalgar's current obligation to pay interest on the principal it has received. In addition, even if interest on the SHARP funds is waived in part or in whole, the SHARP assistance would constitute either a low-interest or interest-free loan, both of which are still loans. (See id.) If the principal still must be repaid, the reduction or elimination of interest does not convert a loan to a grant.
 
 
 57
 In sum, then, it was not rational for HUD to classify the SHARP funds as a grant rather than a loan. The SHARP contracts have all the indicia of loans. They require repayment of the principal and interest. They are secured by a lien on the property. If Trafalgar does not fulfill its obligations, it agreed to pay all legal costs, including attorney's fees, associated with collection efforts. And the language in the contracts explicitly states that they are loans and not grants.[10] HUD's reasons for classifying them as grants are not reasonable. The expense of repaying the SHARP funds, although incurred after HAP termination, is a cost of owning, managing and maintaining the property. Interest is forgiven only under the state's discretion, and, even if it were forgiven, an interest-free loan is still a loan. We therefore affirm the district court's ruling that HUD's decision to classify the SHARP funds as a grant was arbitrary and capricious.[11]
 
 
 58
 D. Whether the statute of limitations bars Trafalgar's claim that the 1986 FMR should have been used.
 
 
 59
 The Fair Market Rent, or FMR, used in the AHAP and HAP establishes the ceiling for the contract rents and therefore has a significant impact on an owner's subsidy from HUD. Trafalgar argues that HUD improperly used the 1985 FMR instead of the higher 1986 FMR, thereby reducing the funds to which Trafalgar was entitled. The district court found this claim to be barred by the statute of limitations, and Trafalgar challenges this decision on cross-appeal. Application of the statute of limitations by definition involves an appreciation of the dates involved, so our analysis must start there.
 
 
 60
 The FMR is based on the rents actually charged for units in the same area, and the Secretary of HUD is required to establish FMRs "periodically but not less than annually." 42 U.S.C. § 1437f(c)(1). On July 5, 1984, HUD first published the 1985 FMRs as an interim rule with an effective date of October 1, 1984. The 1985 FMRs were published in final rule form on April 16, 1985.
 
 
 61
 The AHAP was executed on April 30, 1986. In accordance with the regulations, it specified that the initial contract rents would be based on the FMRs then in effect, which were the 1985 rates. The 1986 FMR applicable to the project was published and made effective on August 29, 1986, four months after AHAP execution, and twenty-two months after the 1985 FMR had gone into effect.
 
 
 62
 On April 17, 1990, the parties executed the final stage of the HAP contract. Trafalgar argued that the base and contract rent ceilings should be based on the 1986 FMR, but HUD insisted on using the 1985 rate. Trafalgar chose to pursue administrative remedies, which were exhausted with HUD's final denial on April 7, 1995.
 
 
 63
 Trafalgar filed its claim in the district court on June 15, 1995. It argued that, consistent with the statutory requirement, the 1986 FMRs should have been established by October 1, 1985, one year after the 1985 FMRs went into effect. Had HUD followed the statutory mandate to set the FMRs no less than annually, the AHAP and HAP would have used the 1986 FMRs.
 
 
 64
 A complaint under the APA for review of an agency action is a civil action that must be filed within the six year limitations period set forth in 28 U.S.C. § 2401(a). See, e.g., Daingerfield Island Protective Society v. Babbitt, 40 F.3d 442, 445 (D.C.Cir.1994); Wind River Mining Corp. v. United States, 946 F.2d 710, 712 (9th Cir.1991). The only two relevant actions within six years of the June 15, 1995 filing of the complaint are the HAP execution on April 17, 1990, and the conclusion of administrative appeals on April 7, 1995. Appreciating this fact, Trafalgar argues that the claim did not accrue either until the HAP was executed or until Trafalgar had exhausted its administrative remedies. In its decision that Trafalgar's claim was barred by the statute of limitations, the district court implicitly rejected Trafalgar's first argument, and explicitly rejected the second.
 
 
 65
 1. HAP execution. In general, "[a] cause of action against an administrative agency 'first accrues,' within the meaning of § 2401(a), as soon as ... the person challenging the agency action can institute and maintain a suit in court." Spannaus v. DOJ, 824 F.2d 52, 56 (D.C.Cir.1987). Under the APA, the injured party can maintain a suit once the agency has issued a "final agency action." 5 U.S.C. § 704; see, e.g., Sierra Club v. Slater, 120 F.3d 623, 631 (6th Cir.1997); Dunn-McCampbell Royalty Interest, Inc. v. National Park Serv., 112 F.3d 1283, 1287 (5th Cir.1997). In determining whether a particular agency action is final, "[t]he core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." Franklin v. Massachusetts, 505 U.S. 788, 797, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992). To be a "final agency action," it must be a "definitive statement[ ] of [the agency's] position" with "direct and immediate" consequences. FTC v. Standard Oil Co., 449 U.S. 232, 241, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980).
 
 
 66
 Determining which HUD statement was the final agency action is a relatively straightforward exercise. HUD regulations require that initial rents are capped at the FMR "applicable to the unit on the date that the [AHAP] is executed." 24 C.F.R. § 882.408(c) (1998). This limit applies to both the AHAP and HAP, even though payments do not commence until rehabilitation has been completed and the parties have executed the HAP, which may be well after the date of the AHAP. Therefore, the final agency action for the purpose of commencing the statute of limitations was the final statement by HUD setting the FMR that applied on the date of AHAP execution.
 
 
 67
 The 1985 FMR was in effect at the time of AHAP execution on April 30, 1986. Although HUD should have promulgated the 1986 FMRs by that time, HUD followed the regulation requirement to apply the FMR then in effect. A strong argument can be made that AHAP execution was the final agency action for the purpose of commencing the statute of limitations.[12]
 
 
 68
 However, one could also argue that the final agency action did not occur until HUD actually issued the 1986 FMR on August 29, 1986. On that date, at the latest, Trafalgar learned that HUD would not apply the new rate to its previously executed AHAP. Prior to that date, Trafalgar had a possible argument that the 1986 FMR, which reflected rates as of April 1, could be applied retroactively to the AHAP executed April 30.[13]
 
 
 69
 Deciding which of these decisions was the final agency action is unnecessary, because both occurred well outside the statute of limitations. Even if the issuance of the 1986 FMR were the final agency action, rather than AHAP execution, Trafalgar would have been required to file its action in court before August 29, 1992, six years later. Trafalgar's complaint was not filed until June 15, 1995, almost three years after the expiration of the statute of limitations.
 
 
 70
 Trafalgar argues that the HAP was the final agency decision because HUD could change the terms of the contract between the AHAP and HAP. The relevant regulation allows HUD to change the contract rent between the AHAP and HAP under certain limited circumstances: unexpected changes in rehabilitation costs, changes in financing, changes in relocation payments to tenants, or to correct errors in computation. See 24 C.F.R. § 882.408(d)(1) (1998). None of these situations applies. Moreover, the regulations specifically require application of the FMR applicable on the date of the execution of the AHAP. HUD's issuance of the 1986 FMR was therefore the final agency action with respect to Trafalgar's claim.[14]
 
 
 71
 2. Exhaustion of administrative remedies. In the alternative, Trafalgar alleges that the cause of action did not accrue until it had exhausted all available administrative remedies. The district court rejected this argument, ruling that Trafalgar's decision to pursue administrative remedies not explicitly a prerequisite to suit did not affect the accrual of its claim.
 
 
 72
 The Supreme Court has held that "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51, 58 S.Ct. 459, 82 L.Ed. 638 (1938). "In practice, the doctrine has softer edges than this language implies." Portela-Gonzalez v. Secretary of the Navy, 109 F.3d 74, 77 (1st Cir.1997). When Congress explicitly requires that administrative remedies must be pursued before seeking judicial relief, litigants must obviously follow that mandate. See Coit Independence Joint Venture v. FSLIC, 489 U.S. 561, 579, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989). On the other hand, "where Congress has not clearly required exhaustion, sound judicial discretion governs." McCarthy v. Madigan, 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992).
 
 
 73
 While most of the decisions regarding administrative remedies involve whether the litigant has filed suit too early, i.e., before exhaustion of administrative remedies, this case involves the opposite question. We must consider whether or when a party that does pursue administrative remedies before filing suit is barred for untimeliness.
 
 
 74
 In this latter event, it makes a difference whether the administrative route is mandatory, i.e., a condition precedent to suit, or permissive, i.e., permitted but not required as a condition precedent. In the former situation, the cause of action does not accrue until the completion of the required administrative proceedings. See Crown Coat Front Co. v. United States, 386 U.S. 503, 522, 87 S.Ct. 1177, 18 L.Ed.2d 256 (1967); United States v. Suntip Co., 82 F.3d 1468, 1475 (9th Cir.1996); United States v. Gordon, 78 F.3d 781, 786 (2d Cir.1996). In the latter situation, the cause of action accrues at the time of the injury. See Unexcelled Chemical Corp. v. United States, 345 U.S. 59, 65, 73 S.Ct. 580, 97 L.Ed. 821 (1953); Brighton Village Assoc. v. United States, 52 F.3d 1056, 1060 (Fed.Cir.1995).[15] Trafalgar has throughout its briefings consistently ignored this contrast, which we specifically recognized in United States v. Meyer, 808 F.2d 912 (1st Cir.1987).
 
 
 75
 The district court correctly recognized this distinction in holding that Trafalgar's claim accrued before it began to seek permissive administrative remedies.[16] Trafalgar was entitled to pursue administrative remedies, but its choice to do so did not stop the statute of limitations from running.[17]
 
 III. Conclusion
 
 76
 We reverse the district court's determination that HUD acted in an arbitrary and capricious manner in excluding the pre-AHAP costs from the base rents and in maintaining the status quo when offsetting mistakes were made. The district court, however, correctly concluded that HUD was arbitrary and capricious in treating the SHARP funds as a grant instead of a loan. Trafalgar's claim to use a different year FMR was time-barred, as the district court appropriately found.
 
 
 77
 Accordingly, the district court's judgment is affirmed in part and reversed in part. HUD to receive half its costs.
 
 
 
 [1]
 In federal court in Massachusetts, an action on behalf of a limited partnership must be brought in the name of its general partner. See Fed.R.Civ.P. 17(b); Roberts-Haverhill Assoc. v. City Council of Haverhill, 2 Mass.App.Ct. 715, 319 N.E.2d 916, 920 (1974). Trafalgar, as a general partner of Heywood-Wakefield, filed suit on behalf of the partnership. For the sake of simplicity, we will use "Trafalgar" to refer to both Trafalgar and Heywood-Wakefield
 
 
 [2]
 The Moderate Rehabilitation Program was eliminated as of October 1, 1991, but existing projects were allowed to continue. See Cranston-Gonzalez National Affordable Housing Act, tit. II, subtit. F, § 289(a)(4), (b), Pub.L. No. 101-625, 104 Stat. 4079, 4128. For ease of reference, we will cite to regulations from the most recent Code of Federal Regulations where the language in effect at the time is the same
 
 
 [3]
 The monthly rehabilitation debt service is based solely on rehabilitation costs spread over the term of the HAP, and is not adjusted annually
 
 
 [4]
 There is scant evidence of the parties' actual agreement at the February 5 meeting. The most contemporaneous evidence was a February 12 letter from the Massachusetts Executive Office of Communities and Development to Trafalgar containing "a summary of [the] discussion." (App. at 151-53). In that letter, EOCD noted that, subject to HUD approval, the rent calculations could include costs expended to date if those costs came from "actual cash equity." Hence, the importance of "actual cash equity" was apparent to the parties at the time. See infra pp. 11-13. In its motion for summary judgment, Trafalgar submitted an affidavit of its president, William H. Berg. The affidavit, sworn to more than a decade after the meeting, states that the previously included costs "would be included" in the rent calculations, but fails to state how that would be accomplished
 
 
 [5]
 The detailed instructions for operational costs such as insurance and taxes confirm this view. See HUD Handbook, p. 11
 
 
 [6]
 HUD has established a similar system for repaying rehabilitation costs. If rehabilitation is financed through borrowed funds, the principal and interest are included in rehabilitation debt service. If the owner has paid for rehabilitation out of owner capital, HUD pays the owner interest on those funds based on an imputed interest rate. HUD Handbook, pp. 7, 17
 
 
 [7]
 Although the district court did not address the issue, the Regional Administrator's decision to grant an exception rent was erroneous for two reasons. First, exception rents are permitted if HUD has determined that the rents in the specified area "are more than 10 percent higher than the Existing Housing Fair Market Rents." 24 C.F.R. § 882.408(b) (1998). Use of the present tense in this regulation indicates that the rents must currently be above the FMR. The documentation supporting the Regional Administrator's grant did not analyze current rents in the area and compare them to the FMR. Instead, the documents show that the decision was made because the Regional Administrator predicted that property values and housing costs would increase significantly in the near future. (See App. at 148)
 Second, the operative language of the same regulation allows the public housing agency to approve exception rents "for all units of a given size in specified areas " where the local rents exceed the FMR. 24 C.F.R. § 882.408(b) (1998) (emphasis added). The HUD Handbook describes a specified area as "an entire locality, municipality or county with a Fair Market Rent area or for a specific neighborhood(s)." HUD Handbook, Ch. 10, 10-2(c)(1), p. 10-1. The record indicates that the request was approved for this single project, and not for a specified area. (See App. at 149 (request for an exception rent "is approved for the subject project."); App. at 142 (requesting an exception rent "for a specific project, the Heywood-Wakefield Building")).
 Trafalgar does not argue that the Regional Administrator's decision was correct, but rather that HUD is bound by that decision, correct or not.
 
 
 [8]
 Although the district court decided to separate the costs from one another, it was acceptable for HUD to consider the errors jointly, as it did. Paragraph 1.5(a) of the HAP gives HUD the authority to "change [the contract rent] in accordance with HUD requirements, including the correction of errors in computation." (App. at 31). An argument could be made that the time for recalculation pursuant to p 1.5 had expired. If so, Trafalgar's claim would be moot since the current contract rents would continue to apply. Assuming that time had not foreclosed any challenge, both mistakes were found and "change[d] in accordance with HUD requirements." (Id.)
 
 
 [9]
 It is not clear whether the regulation can even be applied at this late date. The title of this subsection is "Changes in Initial Contract Rents during rehabilitation." 24 C.F.R. § 882.408(d) (1998). Two sister circuits have held that the regulation authorizes only changes that occur prior to the end of rehabilitation. See Foxglenn Investors L.P. v. Cisneros, 35 F.3d 947, 953 (4th Cir.1994) ("This regulation clearly addresses HUD's authority to change contract rents during rehabilitation. Since the reductions in this case occurred well after rehabilitation, this regulation would appear to be inapplicable."); Terrace Hous. Assoc., Ltd. v. Cisneros, 32 F.3d 461, 464 (10th Cir.1994) ("It is clear that [§ 882.408(d)(1) ] does not apply here because rehabilitation was completed long ago."). However, since the regulation is unavailing to Trafalgar even if it were applicable, the court need not address whether it applies
 
 
 [10]
 In reaching this conclusion, we are not saying that the language in the legislation and the contracts is necessarily always controlling. However, nothing in this case indicates that the language is inconsistent with reality
 
 
 [11]
 We note that our conclusion is influenced by the fact that HUD admittedly has no rules or procedures for determining whether funds are loans or grants. It is precisely this sort of ad-hoc standardless determination that is likely to be arbitrary and capricious under the Administrative Procedure Act. See Morton v. Ruiz, 415 U.S. 199, 232, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974) ("The Administrative Procedure Act was adopted to provide, inter alia, that administrative policies affecting individual rights and obligations be promulgated pursuant to certain stated procedures so as to avoid the inherently arbitrary nature of unpublished ad hoc determinations.")
 
 
 [12]
 This conclusion is bolstered by the fact that Trafalgar was on notice that the AHAP would use the 1985 FMR and HUD would not countenance a request by Trafalgar to use the 1986 FMR in the AHAP or HAP. A section of the February 12 EOCD letter summarizing the February 5 meeting addresses the issue of possible revisions to the FMRs from the 1985 levels then in effect. Specifically, Trafalgar was on notice that "[n]either EOCD nor HUD will allow any re-computation of rents for this project to occur if and when the FMRs are reissued." (App. at 152)
 
 
 [13]
 It should be noted that the statute would seem to preclude retroactive application of the FMR, because the FMR "shall become effective upon the date of publication in final form in the Federal Register." 42 U.S.C. § 1437f(c)(1)
 
 
 [14]
 Trafalgar also argues in its reply brief that the HAP could have included the 1986 FMR because HUD had the power to waive "any provision" of the regulatory scheme for good cause, subject to statutory limitations. See 24 C.F.R. § 899.101(a) (1995). However, Trafalgar failed to make this argument before the district court. As a result, the argument has been waived. See Timberland Design v. First Serv. Bank for Sav., 932 F.2d 46, 51 (1st Cir.1991) ("It is clearly established that arguments not raised at the district court level will not be considered on appeal.")
 
 
 [15]
 Consistent with this, if a claim arises under the APA, courts may not exercise their judicial discretion to require exhaustion of administrative remedies if the statute and agency rules do not otherwise require exhaustion. See Darby v. Cisneros, 509 U.S. 137, 153-54, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993). However, if the statute at issue explicitly mandates exhaustion as a prerequisite to judicial review, it must be enforced. See id
 
 
 [16]
 It is not clear from Trafalgar's briefs whether it concedes that the administrative remedies were permissive. Nevertheless, the permissive nature of the remedies is clear to the court: nothing required that they be pursued. No formal administrative remedies were required or even provided for in the statute. HUD has not adopted any agency rule that Trafalgar may not file a complaint until after it has exhausted administrative remedies
 
 
 [17]
 Because the court finds that Trafalgar's claim regarding the application of the 1986 FMR was time barred, it is unnecessary to reach Trafalgar's allegation that HUD was required to disclose a certain document during discovery on that claim